JOHN FRANCIS MAZZAN, APPELLANT, v. THE STATE OF NEVADA, RESPONDENT.

No. 12437

January 30, 1984          675 P.2d 409

---

[3] The Governor designated the Honorable James J. Guinan of the Second Judicial District Court, to sit in the place of THE HONORABLE CHIEF JUSTICE NOEL E. MANOUKIAN, who voluntarily disqualified himself. Nev. Const. art. 6, § 4.

*David G. Parraguirre,* Public Defender, *Jane G. McKenna,* Deputy Public Defender, for Appellant.

*Brian McKay,* Attorney General, Carson City; *Mills Lane,* District Attorney, and *Gary H. Hatlestad,* Deputy District Attorney, Washoe County, for Respondent.

## OPINION

*Per Curiam:*

This is an appeal from a judgment of conviction upon a jury verdict of first degree murder and from imposition of the death penalty. For reasons set forth hereinafter, we affirm the conviction of first degree murder, vacate the imposition of the death penalty and remand the case for a new penalty hearing and sentencing.

Much of the last twenty-four hours of the life of the victim were spent with appellant. The victim and appellant were apparently friends, having been introduced because of a common denominator involving drugs. Four witnesses saw the victim and Mazzan together during the day preceding the occasion of the victim's death. The last of the four witnesses was with the victim at the latter's residence until approximately 12:20 a.m. on December 21, 1978. Later that morning, the victim's father came by to visit his son. The door was slightly ajar, despite the fact that the victim was in the habit of locking his door with a door-knob lock, a deadbolt lock and a latch. The victim's father entered the kitchen area of the small one-room residence and saw his son lying dead in a pool of blood.

Police investigating the scene found that the decedent had been stabbed fifteen times. Many of the chest wounds had the same depth and angle, suggesting that the victim was probably asleep at the time of the attack and did not immediately react. The pattern of holes in a bloody blanket near the victim which matched the stab wounds on the body, the blood surrounding those blanket holes and the blood on the couch also suggested that he was asleep on the couch when he was first assaulted. The attack apparently concluded in the kitchen area, just three or four strides from the couch. Footprints in the pool of blood surrounding the victim contained only one unaccounted for shoe pattern, a nobbed sole without a great deal of wear. No bloody footprints were found in the snow outside the residence. No sign of forced entry to the residence was detected. Investigators also found no money or narcotics on the premises, although the victim was known to have both shortly before his death.

Mazzan was contacted by investigators in Las Vegas and later in Reno concerning his knowledge of events surrounding the victim's death. Mazzan said he left the victim just after midnight. When police asked Mazzan about some blood on the

inside of his car window, he admitted he was at the scene of the killing when the attack occurred.

Mazzan offered the following explanation of events leading up to the victim's violent demise. During the evening he and the victim had been smoking a considerable amount of high quality Hawaiian marijuana and taping records. When Mazzan went to leave around 1:00 or 2:00 a.m. his car wouldn't start so he asked if he could spend the night. The victim gave Mazzan a pillow and blanket and Mazzan went to sleep behind the couch. Mazzan next remembers being awakened at dawn by the sound of scuffling. He saw an unknown assailant struggle with the victim and run out the door. Mazzan then heard two people run away and drive off in a car. Mazzan thereupon panicked and drove home. He never reported the incident, purportedly because he was afraid of being mixed up in a drug-related killing. When Mazzan arrived at home, he cleaned his shoes and washed his hands "for a long time." He also had his clothes laundered. When police questioned Mazzan about some jogging shoes which he had purchased four months earlier, the pattern of which matched the nobbed sole footprint in the blood at the scene, Mazzan replied that he had thrown them out a month before because they had worn out.

The afternoon of the day of the killing Mazzan went to work and conducted business "as usual." Two days later while commenting about "coming into some money," he paid his delinquent rent of $100.00 from a two—or three-inch roll of bills. That same day he paid $139.90 in cash for a necklace for his wife. Soon thereafter he flew to Las Vegas. Later, three ounces of marijuana and some other narcotics were found at Mazzan's residence.

During the penalty stage of the trial, Mazzan's counsel had the opportunity and obligation to present any evidence of mitigating circumstances. He chose, instead, to harshly berate the jury for returning its guilty verdict during the prior phase.[1] Counsel neither presented any witnesses nor substantially argued any mitigating considerations on his client's behalf; instead, he displayed an open disdain for the jury and virtually invited the jurors to condemn his client to death. The transcript of defense counsel's unique presentation during the penalty phase covers only four pages.

---

[1]Mazzan's counsel called the jury's verdict of guilty "the greatest act of irresponsibility that I have ever seen." He also told the jury "[I]f you are the conscience of this community, then, I am ashamed to be a member of it." Finally, counsel, who was arguing on the day that Jesse Bishop was executed in Nevada, testily declared:

> If you people favor the death penalty, if you people are considering the death penalty, today is the day for it. Does this make you happy?

Mazzan first assails his convictions in the guilt phase of his trial by contending that his due process rights were violated when the trial court excused a prospective juror for cause when she voiced objections to the death penalty. The touchstone case regarding this issue is Witherspoon v. Illinois, 391 U.S. 510 (1968), where forty-seven potential jurors were summarily excluded without any effort to find out whether they would invariably vote against the death penalty. The Supreme Court held that "a sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply becuase they voiced general objections to the death penalty or expressed conscientiousness or religious scruples against its infliction." *Id.* at 522. Explaining its holding, the Court stated:

> We repeat, however, that nothing we say today bears upon the power of a State to execute a defendant sentenced to death by a jury from which the only veniremen who were in fact excluded for cause were those who made unmistakably clear (1) that they would *automatically* vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before them, or (2) that their attitude toward the death penalty would prevent them from making an impartial decision as to the defendant's guilt.

*Id.* at 522 n. 21. This Court followed *Witherspoon* in Bean v. State, 86 Nev. 80, 85, 465 P.2d 133, 136 (1970), where we stated:

> The U.S. Supreme Court directs that in order for a challenge to be properly asserted under that statute there must be a thorough examination of each juror who asserts a bias for or against the death penalty to determine whether or not his bias can be set aside and whether the juror could nevertheless determine that issue of innocence or guilt and penalty upon the evidence presented before him. If he can then he is a qualified juror and must be allowed to sit unless excused by peremptory challenge.

The record in the instant case reveals a diligent effort by the court to determine the prospective juror's attitude regarding the death penalty. In the course of *voir dire,* it became evident that the venireman in question would automatically exclude the death penalty as an appropriate sentence irrespective of the

Would you like to see Mazzan up there instead of Bishop? Well, there is not a thing that I can do to prevent you from doing that.

nature of the evidence. The court's decision to excuse the prospective juror for cause was fully justified under the circumstances.

The second issue raised by Mazzan regarding his conviction concerns the sufficiency of the evidence to support a verdict of first degree murder. We have reviewed the record thoroughly and find that the jury, acting reasonably, could have been convinced that Mazzan was guilty of first degree murder beyond a reasonable doubt by the evidence it had a right to consider. *See* Hern v. State, 97 Nev. 529, 635 P.2d 278 (1981). We therefore refuse to disturb the jury's verdict on appeal.

We have considered Mazzan's remaining assignments of error regarding the guilt phase and have found them to be without merit. The jury conviction of first degree murder is therefore affirmed.

Turning now to the penalty phase of Mazzan's trial, the issue for our consideration concerns appellant's claim of denial of his Sixth Amendment right to effective assistance of counsel. Mazzan supports his position on appeal by citing his trial counsel's failure to effectively present mitigating circumstances compounded by his antagonistic remarks to the jury.

The penalty phase of a trial is a critical stage at which the right to effective assistance of counsel is extended. Denial of this constitutional right requires that the sentence be vacated. Gardner v. Florida, 430 U.S. 349, 358 (1977); Cunningham v. State, 94 Nev. 128, 575 P.2d 936 (1978).

This Court recently set forth the standard for measuring effective assistance of counsel in Lenz v. State, 97 Nev. 65, 66, 624 P.2d 15, 16 (1981):

> Effective counsel does not mean errorless counsel, but rather counsel whose assistance is within the range of competence demanded of attorneys in criminal cases. Jackson v. Warden, 91 Nev. 430, 432, 537 P.2d 473 (1975). Nevada law presumes that counsel fully discharge their duties, and that presumption can only be overcome by strong and convincing proof to the contrary. Warden v. Lischko, 90 Nev. 221, 223, 523 P.2d 6 (1974). The standard by which a claim of counsel ineffectiveness is to be tested is whether the performance of counsel was of such low caliber as to reduce the trial to a sham, a farce or a pretense. *Id.*

In spite of our stringent standard of review on this issue we do

not hesitate to conclude as a matter of law that the performance of Mazzan's counsel at sentencing exceeded the outer parameters of effective advocacy, thereby reducing the proceeding to a sham, a farce or a pretense. Mazzan's cause would have been far better served without benefit of his counsel's representation during the penalty phase.[2] We are unable to perceive any reason or motive for counsel's actions which would be consistent with even a modicum of effective advocacy. An evidentiary hearing before a district judge as to the motives or strategy behind defense counsel's performance, therefore, is not necessary in this case.[3] The imposition of the death penalty, therefore, is vacated and the case remanded for a new penalty hearing consistent with this opinion. Since we have concluded a new penalty hearing is required, we decline to consider Mazzan's remaining assignments of error regarding the penalty phase of his trial.

The judgment of conviction upon a jury verdict of first degree murder is affirmed. The imposition of the death penalty is vacated and the matter is remanded for a new penalty hearing before a newly empaneled jury.

---

[2]Appellant's counsel on appeal was not trial counsel.

[3]This opinion does not alter our policy, expressed in Gibbons v. State, 97 Nev. 520, 634 P.2d 1214 (1981), that the effectiveness of counsel should be determined in most instances through means of a post-conviction relief proceeding in district court.