EDWARD LEE JONES, Appellant, *v.* THE
STATE OF NEVADA, Respondent.

No. 23451

July 7, 1994 877 P.2d 1052

*Michael Pescetta,* Executive Director, Nevada Appellate and Postconviction Project, Las Vegas, for Appellant.

*Frankie Sue Del Papa,* Attorney General, Carson City; *Rex Bell,* District Attorney, *James Tufteland,* Chief Deputy District Attorney, and *David Price Schwartz,* Deputy District Attorney, Clark County, for Respondent.

# OPINION

*Per Curiam:*

Appellant Edward Lee Jones was convicted of first-degree murder with use of a deadly weapon for the stabbing death of his girlfriend, Pamela L. Williams. The jury found the existence of two aggravating circumstances and sentenced Jones to death. Jones appeals his conviction and sentence, asserting numerous assignments of error. For the reasons stated below, we reverse Jones' conviction and remand for a new trial.

## FACTS

On September 23, 1991, Jones was charged with murder with use of a deadly weapon for the stabbing death of Williams. The State filed a notice of intent to seek the death penalty. The case was tried to a jury in May 1992.

The victim's seven-year-old daughter, Charlene, testified at trial that in August of 1991, Jones was living with her mother, her three-year-old brother, and Charlene. On the morning prior to her mother's death, Charlene saw Jones and her mother arguing over an "important" card, which might have been a bank card. Williams was trying to scoot away from Jones, who was trying to talk Williams into going into the bedroom with him. Jones told Charlene to go into her room, which she did. Charlene fell asleep and later woke to see Jones peeking into her room. Jones stated he was going to the store to get her some cereal and Charlene went back to sleep. Charlene woke up later and tried to enter her mother's bedroom, which was locked. Eventually she succeeded in prying the door open with a kitchen knife. Charlene discovered her mother lying on the floor and ran to the home of a neighbor for help.

The neighbor, Lisa C. Mongeau, testified that on August 22, 1991, between 1:30 and 2:00 in the afternoon, she was awakened by Charlene, who told her that something was wrong with her mother. Mongeau entered the victim's mobile home and saw Williams in a pool of blood on the bedroom floor, eyes open, and wrapped in a blanket. Mongeau called "911" and the police and paramedics soon arrived.

Metropolitan Police Department homicide detectives Karen Good and Norm Ziola responded to the emergency call. Good testified that the victim's body was lying on the bedroom floor wrapped in a bedspread, with the upper part of the body extending into the bathroom, and the body surrounded by a pool of

blood. Good further stated that there was blood smeared on the bed and splattered on the walls inside the bedroom. Good noted various items of men's clothing near the body, including shoes, shirt and shorts, all of which had blood on them. The shirt was saturated, and the shoes had blood on the top and on the soles. Good observed blood splattered in the bathroom sink, "as if someone had washed up" there, and saw a stack of dirty laundry in the bathroom corner, with blood-covered boxer shorts on the top. The victim was clad only in a shirt. Good also noted a "large butcher-type knife" next to the body.

An autopsy of the victim's body revealed a total of thirty-seven stab or cutting wounds, located on the neck, breasts, lower and upper chest, back, arms and hands. The wounds to the arms and hands were characterized as "defensive wounds." The medical examiner, Dr. Giles Sheldon Green, testified that in his opinion the death was homicidal, the direct result of multiple stab wounds, specifically those to the right lung. Green could not eliminate the possibility of strangulation, because the knife wounds to the neck might have overshadowed signs of prior injury.

Police Officer Herbert Brown testified that at 2:30 on the afternoon of the discovery of the body, he and two other officers were on assignment at an apartment complex on North Pecos when they were approached by Rosie Matthews. Ms. Matthews informed the officers that her two sons wanted to speak to them. The officers followed Ms. Matthews to her apartment where they encountered her sons, Gary Jones and the appellant, Edward Lee Jones. Gary explained to the officers that he had violated the terms of his parole by using drugs. Thereafter, the officers turned their attention to Jones, who told them that he had been in a fight with his girlfriend and he thought he had "hurt her real bad." The officers called to check on the address Jones had provided them and discovered that a homicide had occurred there and that Jones was the primary suspect. The officers ceased talking to Jones after explaining his *Miranda* rights. Soon thereafter, Detective Ziola arrived and took Jones into custody.

Brown testified that Jones was not incoherent and did not appear to be under the influence of drugs. Jones was initially able to verbalize well, and appeared to understand what was going on. He was described as quiet and reserved, although he later began crying remorsefully when the officer who checked on the address returned from communicating with Metro. Officer Brown's testimony was corroborated by that of the other two officers.

After Detective Ziola arrived at the North Pecos address and assumed custody of Jones, Ziola advised Jones of his rights and asked if he wished to speak with him. Jones responded affirma-

tively, and Ziola then drove Gary and Jones to Metro's detective bureau. Ziola testified that he had no trouble communicating with Jones and that Jones did not appear to be under the influence of any controlled substance. At the bureau, Ziola again informed Jones of his rights, and Jones signed a written waiver and thereafter agreed to speak to Detective Ziola in a recorded interview. Ziola described Jones' voluntary statement as follows:

> He [Jones] said that he'd been residing at the residence with Pamela Williams and her two children. That the previous night they had been having an argument over his use of narcotics and drinking and staying out. He stated he left that night, stayed gone the whole night. The next morning he came back. The argument started again, escalated to the point where it became physical. He tried to choke her, knocked her on the ground. He went in the kitchen, retrieved a knife, stabbed her, changed his clothes, went to his brother's house and I believe he said he told his brother he had something to tell him, which he never did. And about 2:00 in the afternoon, he asked his brother to call his mother, which the brother did. The mother arrived and that's when she contacted the North Las Vegas Police.

The tape recording of Jones' statement, which presumably corresponded with Ziola's description of what Jones had to say, was also played to the jury, but was not transcribed or included in the record on appeal. Ziola, who was experienced in the field, testified that Jones exhibited no signs during this interview which might indicate he was on crack cocaine, and that his statements were consistent with what Ziola had already seen and learned at the scene of the crime.

A sample of Jones' blood taken at the jail tested positive for a cocaine metabolite. The expert who performed the test stated that the amount of metabolite found in the blood—which was more than ten times the minimum required to test positive for cocaine use—was "average" in regard to what they see at the prison, but also stated that there was no way to tell from the metabolite how much cocaine was ingested. Dr. Green, however, when asked about the amount of metabolite per milliliter found in Jones' blood, testified that it was a relatively high amount.

Following the close of the State's case-in-chief, the defense called Jones' brother Gary to the stand. Gary testified that Williams brought Jones to Gary's apartment on the evening prior to her murder and that Jones and Gary spent the evening drinking beer and smoking crack cocaine. Gary testified that Jones left the apartment in the early morning and returned around 8:00 a.m., asking Gary to go and buy some more cocaine with Jones' money.

After obtaining some more beer and cocaine, Gary called his mother, asking her to come over and then to bring the police so he could get some help with his drug problem. His mother complied. Gary did not recall the police officers saying anything to Jones while they were there. Gary testified that at the police station, the police officer interviewed Gary first, stating that he could not at that time get a statement from Jones, as he was "messed up." On rebuttal, Detective Ziola denied making this statement, maintaining that he had interviewed Jones first. Gary denied remembering Jones ever saying anything to the officers about Williams being hurt.

Jones also took the stand on his own behalf and testified that he met Williams in September of 1990 and began living with her and her children thereafter. He stated that he began using cocaine in November of 1990 and that he spent approximately $8,000 a month on his habit. Jones claimed that his cocaine use caused difficulties in his relationship with Williams. The following events, described in some detail, represent additional trial testimony supplied by Jones.

On the evening prior to Williams' death, Jones and Williams closed the record store which they operated together at around 8:00 p.m.; he told Williams he was going out to a bar with her brother. Jones testified that he drank eight or nine double-shots of tequila at the bar, and that his car broke down on the way home. Jones then walked to Williams' mother's house, where Williams came to pick him up. Williams took Jones to Gary's house, where he was to spend the night. Jones had $400.00, which he gave to Gary to go and buy some cocaine, and the two started drinking beer and smoking cocaine until about 7:00 a.m.

At 7:00 a.m., Jones walked home, a distance he estimated as five or six miles, where he got into an argument with Williams over his bank card. Williams refused to give Jones the card for fear he would use it to obtain money to buy more cocaine. Williams eventually gave Jones the card, and Jones told Charlene to go back to her bedroom, so the two could talk. The pair talked a while longer and at one point Jones turned away from Williams to take off his jewelry before leaving the house. When he turned around, he saw that Williams had picked up a little kitchen knife, and, panicking, he tried to grab it from her, cutting himself. Jones was angered and threw Williams on the bed, then calmed down and allowed Williams to help him attend to his finger, which was bleeding profusely. Unable to stop the bleeding, Jones washed his finger in the sink, and then changed his clothes from the ones he had been wearing all night. Jones denied that the boxer shorts found at the scene belonged to him, stating that he wore a different style and size.

Jones left Williams sitting on the bed and told Charlene that he was leaving to get something to eat. He then went back into the bedroom to get the car keys, and Williams told him to park her car at a friend's place, where she would pick it up later. Jones drove to an ATM machine, where he took out approximately $500.00, parked the car where instructed, and walked the short distance back to Gary's apartment.

Gary came and went throughout the morning, sometimes returning with other persons and with more crack cocaine; at one point Gary attempted to treat his brother's finger. Jones, who assertedly continued smoking crack throughout the day, admitted telling Gary that he and Williams had been in a fight, but said he told Gary she was all right. Gary kept asking about Williams, and Jones began to feel that something was wrong, so he told Gary to call their mother. When their mother arrived, Jones told her that he and Williams had gotten into an argument and that he had gotten cut and requested that she go get the police, whom Gary had seen at the apartment complex. Jones' mother complied. While waiting for the police to arrive, Jones went in the other room and smoked some more crack, then came into the dining room to talk to the police. Jones remembered speaking with one of the officers, but he could not recall which one. Jones testified that he heard on an officer's walkie-talkie that Williams was dead, and at that point he began to cry. He denied ever telling the officers that he had hurt Williams.

Jones testified that he and Gary were taken downtown, where he gave a statement. Jones admitted that the tape recording previously played to the jury was his statement. He also acknowledged that his testimony at trial differed from the tape recorded confession and also from later statements he had made to his counsel to the effect that he really did not remember what happened. He sought to explain the basis for his initial confession by stating:

> At the time when I made the statement, I was hearing a lot of things and I was, there was a lot going on in my mind. And after I heard that she was dead, I didn't feel like I wanted to live anymore either. Once when Pamela was, we was talking about breaking up one time, I tried to kill myself, but she helped me. And after I found out she was gone, I didn't feel like I wanted to live anymore without her. So, I confessed to her [sic].

Jones also testified that his mind had cleared up since the time of his earlier statements, that he now believed that he did not kill Williams, and that he knew "for a fact" that she was not dead when he left her mobile home.

The defense also introduced the testimony of a psychiatrist, Dr. Franklin D. Master, who, testifying on the basis of a single interview with Jones, opined that at the time of the events surrounding Williams' murder, Jones was suffering from "acute encephalopathy," which he defined as a condition "when you've got a chemical affecting . . . the brain substance so that you don't have normal biochemistry occurring." Dr. Master stated that Jones' condition was the result of both current and cumulative past substance use. Master also concluded that at the time of the murder, Jones could not have formulated any intent or premeditated any act.

During closing argument, defense counsel conceded that he thought "the evidence shows beyond a reasonable doubt that the defendant did kill Pamela," but argued that the defendant was guilty of only second-degree murder, as he was incapable of forming the requisite intent and premeditation for first-degree murder. The jury returned a verdict of first-degree murder with use of a deadly weapon.

At the penalty hearing, the State presented various evidence, including a certified judgment of Jones' conviction for "robbery and use of a deadly weapon in commission of a crime." Defense counsel, at Jones' insistence, did not present any evidence at the penalty hearing, but Jones took the stand and apologized to the victim's family, telling the jury to "do what you got to do."

The jury determined that there were two aggravating circumstances: that the defendant had previously been convicted of a felony involving the use or threat of violence to the person of another (robbery with use of a deadly weapon) and that the murder involved the mutilation of the victim. The jury further found that there were no mitigating circumstances sufficient to outweigh the aggravating circumstances and sentenced Jones to death.

This appeal followed.

## DISCUSSION

Jones testified that he did not kill Williams and, when canvassed on the subject following the guilt phase, indicated to the trial court that he did not consent to his counsel's argument that he was guilty of second-degree murder. Indeed, defense counsel conceded in his final argument that Jones did not approve of his attorney's concession that the evidence showed beyond a reasonable doubt that Jones killed Williams. Accordingly, Jones contends that his testimony was undermined by his own attorney, thereby depriving Jones of his right to counsel and to due process.

The State characterizes this issue primarily as one of ineffective assistance of counsel and insists that as such, it should be heard in an evidentiary proceeding for post-conviction relief in the district court. *See, e.g.,* Gibbons v. State, 97 Nev. 520, 634 P.2d 1214 (1981). Jones responds that his counsel's concessions of guilt without his consent (a fact shown on the record before us) and in contravention of his own testimony, were improper per se. He thus contends that reversal is mandated irrespective of any strategic or tactical motives for the concessions that may be disclosed at an evidentiary hearing. If we accept Jones' argument, there is no need for a hearing prior to this court's review. *See, e.g.,* Mazzan v. State, 100 Nev. 74, 675 P.2d 409 (1984) (evidentiary hearing regarding defense counsel's motives or strategy not necessary where Supreme Court determines that no good reason for counsel's actions could exist). We therefore elect to address this issue on direct appeal.

Other courts have determined that closing argument of the type presented here is improper. The rationale for this position was addressed by a federal district court in North Carolina in the context of a habeas petition claiming it was error for defense counsel to concede his client's guilt during the sentencing phase of trial. In accepting the defendant's premise, the court first referred to rulings by other courts concerning concessions of guilt during the guilt phase of trial:

> When counsel concedes a client's guilt during the guilt-innocence phase of trial in spite of the client's earlier plea of not guilty and without the defendant's consent, counsel provides ineffective assistance of counsel regardless of the weight of evidence against the defendant or the wisdom of counsel's "honest approach" strategy. *Francis v. Spraggins,* 720 F.2d 1190 (11th Cir. 1983) [, *cert. denied,* 470 U.S. 1059 (1985)]; *Wiley v. Sowders,* 647 F.2d 642 (6th Cir. 1981) [, *cert. denied,* 454 U.S. 1091 (1985)], *[State] v. Harbison,* 315 N.C. 175, 337 S.E.2d 504 (N.C. 1985) [, *cert. denied,* 476 U.S. 1123 (1986)]. The gravity of the consequences of a decision to plead guilty or to admit one's guilt demands that the decision remain in the defendant's hand. An attorney cannot deprive his or her client of the right to have the issue of guilt or innocence presented to the jury as an adversarial issue on which the state bears the burden of proof without committing ineffective assistance of counsel. "The adversarial process protected by the Sixth Amendment requires that the accused have 'counsel acting in the role of an advocate' (citation omitted). The right to the effective assistance of counsel is thus the right of the accused to require the prosecution's case to survive the crucible of

meaningful adversarial testing." *U.S. v. Cronic,* 466 U.S. 648, 656, 104 S.Ct. 2039, 2045, 80 L.Ed.2d 657 (1984). A lawyer may make a tactical determination of how to run a trial, but the due process clause does not permit the attorney to enter a guilty plea or admit facts that amount to a guilty plea without the client's consent.

Brown v. Rice, 693 F. Supp. 381, 396 (W.D. N.C. 1988), *rev'd on other grounds,* Brown v. Dixon, 891 F.2d 490 (4th Cir. 1989), *cert. denied,* 495 U.S. 953 (1990).[1]

The standard for reviewing claims of ineffective assistance of counsel is as follows:

> First, appellant must demonstrate that his trial counsel's representation fell below an objective standard of reasonableness. Second, appellant must show that counsel's deficient performance prejudiced the defense to such a degree that, but for counsel's ineffectiveness, the results of the trial would probably have been different.

Davis v. State, 107 Nev. 600, 601-02, 817 P.2d 1169, 1170 (1991) (citing Strickland v. Washington, 466 U.S. 668, 687 (1984)). We agree with the analysis of the decisions cited in *Brown* that defense counsel's statements fell below an objective standard of reasonableness. Coming as they did from Jones' own counsel, the concessions completely eroded any doubt that might have been raised in the juror's minds by Jones' protestations of innocence, and in fact made all of Jones' testimony incredible, since defense counsel essentially asserted that his own client was being untruthful.

We are unable to conclude with a strong degree of certainty that the second prong of the *Strickland* test, which requires a showing of prejudice, has also been met. Nevertheless, in a capital case involving an error of this magnitude, we are constrained to give the full benefit of the doubt on this issue to Jones. In addressing this same issue, the Supreme Court of North Carolina determined that prejudice may be presumed where defense counsel improperly concedes his client's guilt:

> Although this Court still adheres to the application of the

---

[1] In *Dixon,* the Fourth Circuit rejected the lower court's reasoning on the question of whether defense counsel's concessions during *sentencing* constituted ineffective assistance of counsel. However, it did not address the lower court's dicta, quoted above, regarding the propriety of such arguments during the *guilt phase* of trial other than to note that the cases cited for this proposition "do not apply" to concessions during the sentencing phase. *Dixon* at 499.

*Strickland* test in claims of ineffective assistance of counsel, there exist "circumstances that are so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified." [Citations omitted.] The Supreme Court has presumed prejudice in various Sixth Amendment cases. . . . Likewise, when counsel to the surprise of his client admits his client's guilt, the harm is so likely and so apparent that the issue of prejudice need not be addressed.

*Harbison*, 337 S.E.2d at 507.

We conclude that Jones' conviction must be reversed and his case remanded for a new trial. We emphasize, however, that our decision is limited to the situation present here, where counsel undermined his client's testimonial disavowal of guilt during *the guilt phase of the trial.*[2]

We also conclude that Jones' remaining assignments of error are without merit or are rendered moot by our decision to remand for a new trial.[3]

## CONCLUSION

For the reasons explained above, the judgment of conviction and the sentence of death dependent thereon, are reversed and vacated and the case is remanded to the district court for a new trial.

---

[2]We do not here address or decide the issue of the propriety or effect of defense counsel's unauthorized concession of his or her client's guilt during the penalty phase of trial.

[3]This is also true for those issues raised by Jones' pre- and post-argument supplemental briefs, which, though not addressed at oral argument, we have addressed as submitted on the briefs.