SLIP OPINION

Cite as 2014 Ark. 268

# SUPREME COURT OF ARKANSAS

No. CR-12-1009

|  |  |
|---|---|
| ZACHARIAH SCOTT MARCYNIUK<br>APPELLANT | **Opinion Delivered** June 5, 2014 |
|  | APPEAL FROM THE WASHINGTON<br>COUNTY CIRCUIT COURT<br>[NO. CR-08-475-1] |
| V. |  |
|  | HONORABLE WILLIAM A. STOREY,<br>JUDGE |
| STATE OF ARKANSAS<br>APPELLEE | AFFIRMED. |

**JOSEPHINE LINKER HART, Associate Justice**

Appellant, Zachariah Marcyniuk, appeals from the Washington County Circuit Court's order denying his petition and amended petition for postconviction relief pursuant to Arkansas Rule of Criminal Procedure 37.5. For reversal, appellant argues that his trial counsel was ineffective for the following reasons: (1) conceding the defense of mental disease or defect; (2) failing to voir dire the jury on the defense of mental disease or defect; (3) implying to the jury that a verdict of not guilty by reason of mental disease or defect would result in appellant's release; (4) failing to conduct a sufficient death-penalty voir dire; (5) failing to inform the jury that mercy could be given in sentencing regardless of whether aggravating factors outweighed mitigating factors; (6) failing to investigate and call mitigation witnesses. We affirm the circuit court's decision.

In 2008, appellant was charged with capital murder and residential burglary in the stabbing death of his former girlfriend, Katie Wood, who was murdered at her residence.

Prior to his trial, appellant entered a plea of not guilty at his arraignment and later added not guilty by reason of mental disease or defect.

Appellant testified at his trial. He testified that he and Wood had broken up three weeks before her death. On the day of her death, around 3:00 a.m., he entered her apartment through an unlocked window, and "look[ed] for signs of infidelity." He testified that he fell asleep and awoke when Wood opened the door. Wood screamed, and he grabbed her. According to appellant, "We were just kind of wrestling and there was a knife. What I remember was getting up and there was blood everywhere." He dragged her body into the bathroom, put her in the bathtub, and exited through the window. He put his bloodied clothes and the knife in a bag and discarded them as he drove to Oklahoma. He was stopped by Oklahoma Highway Patrol for speeding, and he was then arrested on a murder warrant. Appellant admitted that he lied to the trooper when he said he was driving to Amarillo and also when he told the trooper about the cause of the scratches on his face.

Appellant also presented the testimony of Dr. Brad Diner, a forensic psychiatrist hired by appellant. Dr. Diner testified that appellant was a "severely psychologically maladjusted individual" who suffered from recurrent and very severe major depression and also exhibited borderline and schizotypal traits. Dr. Diner further testified that appellant suffered from dissociative amnesia, which would explain why appellant could not remember details surrounding Katie's death. Dr. Diner believed that Katie's screaming when she was first confronted by appellant at her residence set off a "cascade of events in which [appellant] . . . was faced with this sort of ultimate rejection of him, . . . and he literally dissociated and flew

SLIP OPINION

into a rage, much of which he could not recall." According to Dr. Diner's testimony, appellant experienced the murder like a "dream-state," and he "essentially broke with reality for a short time." Dr. Diner testified that during this dissociative period, appellant could not control or conform his behavior to the requirements of the law. He further opined that, while appellant could have been aware at some level that his actions would ultimately hurt or kill Katie, he had no control over his actions and did not have the ability to actually form the intent to kill Katie.

The jury was instructed on the affirmative defense of mental disease or defect. Further, the jury was instructed on the elements of capital murder, as well as the lesser-included offenses of first-degree murder and second-degree murder. Appellant was convicted of capital murder and residential burglary, and he was sentenced to death for capital murder and 240 months' imprisonment for the residential burglary. This court affirmed his convictions and sentences. *Marcyniuk v. State*, 2010 Ark. 257, 373 S.W.3d 243.

With the assistance of postconviction counsel, appellant timely filed in the circuit court a verified petition and amended petition for postconviction relief pursuant to Rule 37.5, in which he asserted that his privately retained attorney, W.H. Taylor, rendered ineffective assistance of counsel at trial. Following a hearing, the circuit court denied appellant's petition, and appellant now brings this appeal.

In an appeal from the denial of a Rule 37 petition, this court considers whether, based on the totality of the evidence, the circuit court clearly erred in holding that counsel's performance was not ineffective under the standard set forth in *Strickland v. Washington*, 466

U.S. 668 (1984). *See, e.g.*, *Cothren v. State*, 344 Ark. 697, 703, 42 S.W.3d 543, 547 (2001). Under *Strickland*, a petitioner raising a claim of ineffective assistance of counsel must first show that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the petitioner by the Sixth Amendment to the United States Constitution. *Strickland*, 466 U.S. at 687. A petitioner making an ineffective-assistance-of-counsel claim must show that counsel's performance fell below an objective standard of reasonableness. *Id.* at 687–88. In doing so, the claimant must overcome a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. *Id.* at 689. Further, the petitioner must show that counsel's deficient performance so prejudiced petitioner's defense that he was deprived of a fair trial. *Id.* at 687. Such a showing requires that the petitioner demonstrate a reasonable probability that the fact-finder's decision would have been different absent counsel's errors. *Id.* at 694.

In his first point on appeal, appellant argues that Taylor was ineffective because during opening and closing argument, he conceded the defense of mental disease or defect. He contends that "[t]hese statements to the jury effectively gave away [appellant's] only defense," and "[i]nstead of a possible defense, [appellant] was left with a conviction for capital murder, and ultimately, the death penalty." Appellant asserts that Taylor "conceded that the defense had no merit and [that] the jury should not be so 'naive' as to find it applicable." Appellant further asserts that Taylor "eroded any chance [appellant] had at a not-guilty verdict, did away with the mental disease or defect defense, and devastated the credibility of all of the witnesses that testified to the issues with [appellant's] mental illness." He observes that the concession

SLIP OPINION

"was deficient because it threw away the adversarial nature of the trial, which is the method by which our system produces a just result."

As both parties point out, appellant failed to specifically plead this particular claim below, and the circuit court did not issue any findings of fact or rulings on the matter. In *Jones v. State*, 340 Ark. 1, 5, 8 S.W.3d 482, 484–85 (2000), this court quoted from *Johnson v. State*, 321 Ark. 117,137, 900 S.W.2d 940, 951 (1995), stating as follows:

> This is an appeal from the trial court's denial of the Rule 37 petition, and our general rule is that specific allegations of ineffectiveness of counsel must be pleaded, and specific issues of ineffectiveness of counsel cannot be raised for the first time on appeal. However, in death penalty cases we will consider errors argued for the first time on appeal where prejudice is conclusively shown by the record and this court would unquestionably require the trial court to grant relief under Rule 37. In *Sumlin v. State*, 273 Ark. 185, 617 S.W.2d 372 (1981), we said an error may be argued for the first time on appeal in a death case only when it is "of such magnitude that it would require us to take note of an error which involved a fundamental deprivation of the right to a fair trial."

*Jones*, 340 Ark. at 5, 8 S.W.3d at 484-85 (internal citations omitted). Thus, in death-penalty cases, this court may address issues raised for the first time on appeal from the denial of a Rule 37 petition where prejudice is conclusively shown by the record. *Jones*, at 5–6, 8 S.W.3d at 485. Such prejudice is shown only when there is an error of such magnitude that it deprived the petitioner of the fundamental right to a fair trial. *Id*. at 6, 8 S.W.3d at 485. Where prejudice is not conclusively shown, the issue is procedurally barred and we may not reach the merits. *Id*., 8 S.W.3d at 485. Thus, the question before this court is whether the record in this case conclusively shows that appellant was prejudiced by Taylor's purported concession of the defense of mental disease or defect.

5

SLIP OPINION

Taylor's remarks to the jury in opening and closing arguments indicate that the focus of his remarks was not to seek an acquittal on the defense of mental disease or defect, but to pursue an acquittal on the capital–murder charge by arguing for a conviction on the lesser–included offense of second-degree murder. In opening argument, Taylor addressed the jury as follows:

> This case is really about four different things. One, why [Katie Wood's] completely needless death occurred; two, *the classification under our system of what type of murder was committed by [appellant]; three, punishment to be levied by you against [appellant]. There will be evidence this is not a capital-murder case. There will be evidence presented that this is not a first-degree murder case. The evidence will point you in the direction that this is a second-degree murder case.* You will hear evidence on all of this and the Judge will instruct you on the law. The fourth thing this case . . . is it's about mental illness. [Appellant] has been ill for a very long time, many years. And but for his mental illness Katie Wood would be alive today.
>
> . . . .
>
> But the evidence will show to you without a doubt that he's mentally ill. You won't have any doubt about that when this case is over. And then corresponding this dissociative state that he entered into, *it makes it impossible under the law for him to have committed capital murder or first-degree murder. The reason it's a second-degree murder is whenever you're aware of some of the intended circumstances, that your conduct is practically certain to cause the death of someone under circumstances manifesting extreme indifference to the value of human life. That's second-degree murder. That's what this is.* He does not expect to walk out of here without you punishing him. . . . *Your burden will be to listen to the facts, listen to the law, and classify this crime, determine is it capital murder, is it first-degree murder, is it second-degree murder.* And the way you do that is by looking at his mental state, and looking at his mental illness, and the punishment that you impose in this case must be done against the background of his mental illness. He is weaker than everyone of you, and but by the same token, he understands he needs to be punished for what he did.

(Emphasis added.)

In closing argument, Taylor argued:

I told you this case was about four things and I submit to you that's what this case is about. It's about, not what about happened over there or who done it. There's no question that he done it. There's just no question about that. But I told you the four things were, is why her completely needless death occurred, *how you classify this crime, then how you punish him.* And I told you one other thing. It's about mental illness. I don't think there can be any question as you sit here and you look at him and you listen to these doctors, that you would not come to the conclusion that he suffers from mental illness. And by the same token, *I am not so naive and I do not expect you to be so naive as to let him walk out of this courtroom.* I would be doing him a grave disservice if I did that because the facts are the facts. But you can't lose sight of the fact that he is mentally ill. . . . And he is different than you and I, he is different in that he cannot conform his conduct at certain times whenever he gets all stressed out.

And part of this disorder is you do have severe dissociative symptoms. And what you're going to be faced with when you go back and start deliberating this case is you're going to have to ask yourself can you really believe in mental illness. Do you really believe in that or are you going to be overtaken by its emotion and the terrible tragedy of this case. All the doctors say he has this, and all the doctors, both doctors say that you can have severe dissociative symptoms. I submit to you that the evidence certainly reflects that.

. . . .

The first [jury instruction] I want to talk about is the last one that the Judge read to you, which is premeditation and deliberation. . . . In order to find [appellant] acted with a premeditated and deliberate purpose you must find he had the conscious object to cause death, that he formed the intention before acting as a result of weighing in the mind of the consequences of the course of conduct that distinguished from acting upon sudden impulse without the exercise of reasoning power. . . . What you literally get down to in this case is asking yourself why, why would this happen at 7:20 in the morning on March the 9th of 2008? Why would this happen? And the only answer that you can come up with is but for the fact that he is mentally ill it would not have happened. When she started screaming as suggested by Dr. Diner, something snapped in him. . . . *I don't believe this is a capital murder. If you will look at the elements of capital murder, you have got to find he acted with premeditation and deliberation. I don't think it's a first-degree murder because you have to find that it was conscious object to kill her. And if you believe he was in a dissociative state, that cannot be so. As you heard Dr. Diner, however, he related that there are some things that he does remember. He remembers this knife and he remembers getting the knife. If you look at the definition of second-degree murder, it fits this crime. . . . Second-degree murder uses as a mental state knowing. And knowing is this. A person*

*acts knowingly with respect to his conduct or intended circumstances when he is aware that his conduct is of that nature or that such circumstances exist. A person acts knowingly with respect to a result of his conduct, and this is the important part, a person acts knowingly with respect to a result of his conduct when he is aware that it is practically certain that his conduct will cause such a result. If he is conscious of wrestling with this girl, of fighting in that kitchen, and he is aware of a knife, then it is practically . . . certain that his conduct will cause such a result. And such a result is what is defined in second-degree murder, see if this doesn't fit, when someone acts under circumstances manifesting extreme indifference to the value of human life. Now when you take that together and you put in the mix his mental illness and you ask yourself this question. Why would it happen? Why would it happen . . . unless he is mentally ill. . . . [H]e is sick and . . . he is mentally ill. And you should take that into consideration in determining what charge you find him guilty of. . . .*

I want to talk about . . . the instruction of mental disease or defect. As an old lawyer, I've come to the pretty firm conclusion that juries don't much like mental disease or defect because they are like the rest of us. They can't really accept the idea that we just turn people out after they've done things that are wrong. But what the jury instructions say is even if you don't find this mental disease or defect, remember the next instruction the Judge read to you. *He said if you find that the defense of mental disease or defect has not been established, evidence that [appellant] suffered from a mental disease or defect may still be considered by you in determining whether [appellant] had the required mental state to commit the offense charged. So you get to take into consideration, under the law, his mental state, his mental disease in determining whether or not he can form the intent. Whether or not he can form premeditation and deliberation. Whether or not he can form conscious intent to kill. I would ask you to return a verdict of second-degree murder.*

(Emphasis added.)

At the Rule 37.5 hearing, appellant did not elicit testimony from Taylor regarding his opening argument. As to statements made during closing argument, Taylor testified that he wanted the jury to believe that appellant "had committed second-degree murder and that was the best we were going to do." Taylor testified that it was not appellant's conscious object to cause her death because he was unable to conform his conduct to the requirements of the law. He testified that he did not

Cite as 2014 Ark. 268

get in front of the jury and say that they must find him not guilty by reason of mental disease or defect because you've got to keep your credibility in front of a jury. You have to be realistic about what is possible and what could happen in the case. I thought there was a better shot at the jury finding him guilty of something less than capital than there was of them outright acquitting him on mental disease or defect. Zach and I talked about that extensively. He latched onto the idea that it was a second-degree murder. That's what he was guilty of and I tried my best to tell him that the jury wasn't going to see it that way. . . . It was part of my strategy *to not ask* the jury to find him not guilty by mental disease or defect, let him go, or sentence him to the State Hospital. I argued in closing that it mitigates him down and lessens his culpability and it should be a murder second. It was certainly all part of my strategy.

(Emphasis added.)

The basis for appellant's argument on appeal was that Taylor conceded the defense of mental disease or defect and that this was his only defense. Appellant cites to cases from other jurisdictions, particularly, *Jones v. State*, 877 P.2d 1052 (Nev. 1994), and *Francis v. Spraggins*, 720 F.2d 1190 (11th Cir. 1983), for the proposition that it constitutes ineffective assistance of counsel to concede a defendant's guilt after the defendant has testified that he is innocent. Arguing by analogy, he contends that Taylor's remarks effectively destroyed the credibility of his expert witness, Dr. Diner, who presented testimony that during his dissociative period, appellant could not control or conform his behavior to the requirements of the law.

Appellant contends that Taylor conceded his only defense. The factual premise of appellant's argument, however, is flawed because it is an incorrect characterization of what occurred at trial. As indicated by Taylor's testimony at the Rule 37.5 hearing and as evidenced by his remarks to the jury during opening and closing arguments, his trial strategy was to use evidence that appellant was suffering from a mental disease or defect to ask the jury to return

a verdict of guilty on the lesser-included offense of second-degree murder.

We note that appellant did not argue either at trial or on appeal that Taylor was ineffective for seeking an acquittal on the capital-murder charge by pursuing a second-degree murder conviction rather than seeking an outright acquittal based on mental disease or defect. We conclude that the issue is procedurally barred. We recognize, however, that in *O'Rourke v. State*, 298 Ark 144, 155–56, 765 S.W.2d 916, 923 (1989), this court granted permission for an evidentiary hearing to consider whether trial counsel was ineffective for requesting jury instructions on an insanity defense but not on the lesser-included offenses of capital murder. Nevertheless, as Taylor made clear in his testimony quoted above, he had concluded that obtaining an outright acquittal was unlikely. Taylor testified,

> He disposed of the murder weapon and some of the clothing. There was some evidence of cover up at the scene. He had put her body in the bathtub, put the curtains over it, locked the bathroom door, locked the front door, and fled out the back window. The video of the traffic stop was a real bad piece of evidence for [appellant]. He was pretty cool and calm during that situation and made up a story about going to Amarillo and the scratches. His demeanor was so destructive on the video tape. You have this terrible killing and then you have him being pretty cool five, six hours later. . . . I thought I would have lost all credibility in telling the jury he's not guilty based upon the photos. I couldn't explain why this girl started screaming as soon as this door was opened. I didn't believe the jury was going to believe that he remembered everything clearly running up to the actual stabbing and remembered everything after the actual stabbing, just not the actual stabbing. . . . I was faced with a lot of goal-oriented behavior before the death of this girl and a lot of goal-oriented behavior after her death. I could never get a good answer to why he would take the murder weapon away from the scene.

Taylor explained why he pursued a trial strategy in which he sought to obtain a second-degree murder conviction rather than an acquittal based on mental disease or defect. Thus,

Taylor's actions were in furtherance of his trial strategy, and we cannot say that his performance was deficient.[1] Therefore, the record does not conclusively show prejudice in the form of an error of such magnitude that it involved a deprivation of appellant's fundamental right to a fair trial.

In his second point on appeal, appellant argues that Taylor was ineffective in failing to voir dire the jury on the defense of mental disease or defect. He asserts that Taylor "failed to voir dire the jury to make sure that he had twelve individuals that were willing to accept that someone could be not guilty of a brutal murder under the law due to a mental disease or defect." Appellant alleges that prejudice was established because there is "a very real likelihood that at least one of the jurors would never have accepted the defense." The circuit court considered the issue and found that "trial counsel thoroughly covered all issues relating to mental disease or defect through voir dire and by use of the jury questionnaire."

To prevail on an allegation of ineffective assistance of counsel with regard to jury selection, a petitioner must overcome the presumption that jurors are unbiased. *Echols v. State*, 354 Ark. 530, 556, 127 S.W.3d 486, 503 (2003). To accomplish this, a petitioner must

---

[1]As we observed in *Robinson v. State*, 2012 Ark. 356, at 3–4 (per curiam) (citing *Martinez v. Ryan*, ___ U.S.___, 132 S. Ct. 1309 (2012)), we are mindful that the United States Supreme Court has held that "when State law requires a prisoner to use a collateral attack rather than a direct appeal to raise a claim that his trial attorney was not effective under the Sixth Amendment, the prisoner's failure to comply with State rules in bringing his collateral attack on the judgment will no longer bar a federal judge from granting habeas relief on that claim, if the prisoner had no attorney to represent him in the collateral proceeding or that attorney was ineffective and if the petition filed in the State court had a meritorious claim." Our review of procedurally defaulted issues pursuant to *Jones* comports with any requirements established by *Martinez* and its progeny.

demonstrate actual bias, and the actual bias must have been sufficient to prejudice the petitioner to the degree that he was denied a fair trial. *Id.*, 127 S.W.3d at 503. Bare allegations of prejudice by counsel's conduct during voir dire that are unsupported by any showing of actual prejudice do not establish ineffective assistance of counsel. *Id.*, 127 S.W.3d at 503.

Here, appellant failed to overcome the presumption against an unbiased jury because he did not identify, at the Rule 37.5 hearing or on appeal, any particular juror who was biased. Rather, appellant asks this court to assume, based on his conclusory allegations, that an unbiased, impartial jury was not seated for trial. Moreover, it is worth noting that during voir dire, the State told the jury as follows:

> Under the law, if you find the Defendant guilty and you consider the defense of mental disease or defect, the law states that . . . a person is not criminally responsible for their conduct if at the time of that conduct, in this particular case the murder, as a result of a mental disease or defect the Defendant lacked the capacity to appreciate the criminality of his conduct or conform his conduct to the law. Does everybody understand that? Does anyone have problem with that or didn't catch all of it or needs something further explained to them as far as that's concerned?

It was appropriate for Taylor to consider responses to questions asked by the State as well as responses to his own questions. Thus, in keeping with *Strickland*, appellant has not shown that Taylor's performance fell below an objective standard of reasonableness or that his performance so prejudiced appellant's defense as to deprive him of a fair trial.

In his third point on appeal, appellant asserts that, during opening and closing arguments, Taylor implicitly told the jury that appellant would be released if the jury returned a verdict of not guilty by reason of mental disease or defect. Appellant contends that this was

12

an incorrect statement of the law and that Taylor's commentary during opening and closing arguments "undermined confidence in this verdict." This issue was not addressed in the circuit court. As noted above, in death-penalty cases this court may address issues raised for the first time on appeal from the denial of a Rule 37 petition if prejudice is conclusively shown by the record. *Jones*, 340 Ark. at 5–6, 8 S.W.3d at 485.

Arkansas Code Annotated section 5-2-312(a)(2) (Repl. 2013), provides that, when the affirmative defense of not guilty by reason of mental disease or defect is presented to the jury, the jury shall be instructed in accordance with Arkansas Code Annotated section 5-2-314 (Repl. 2013), which outlines the disposition process for determining whether a defendant acquitted on the defense of mental disease or defect should be discharged or committed to the custody of the Department of Human Services for further psychological testing. The jury was instructed in accordance with AMI Crim. 2d 609, which follows the language of section 5-2-314. Specifically, the circuit court instructed the jury as follows:

> If you find Zachariah Marcyniuk not guilty by reason of mental disease or defect, the court will conduct a hearing. If the court determines that Zachariah Marcyniuk is no longer affected by mental disease or defect, the court will immediately discharge Zachariah Marcyniuk. If the court determines that Zachariah Marcyniuk remains affected by mental disease or defect, the court will order the Defendant committed to the custody of the Director of the Department of Human Services for an examination by a psychiatrist or licensed psychologist. The Defendant will not be released from custody unless it is determined that Zachariah Marcyniuk's release would not create a substantial risk of bodily injury to another person or serious damage to property of another person.

Thus, the jury was apprised of what would happen if a verdict of not guilty by reason of mental disease or defect were returned. In accordance with *Jones*, because the record does

13

not conclusively demonstrate that prejudice occurred, the issue is not preserved for appellate review.

In his fourth point on appeal, appellant argues that the circuit court erred in not finding that Taylor was ineffective when he failed to conduct a sufficient voir dire for a death-penalty case. Appellant raises two subpoints. First, citing *Morgan v. Ilinois*, 504 U.S. 719 (1992), appellant asserts that Taylor performed deficiently in failing to "life qualify" the jury by asking during voir dire whether the prospective jurors would automatically impose the death penalty. Second, citing *Witherspoon v. Illinois*, 391 U.S. 510 (1968), appellant asserts that Taylor was ineffective for failing to attempt to rehabilitate four jurors who had been struck for cause by the State. Appellant asserts that, as a result of Taylor's failures during voir dire, he was prejudiced because the State was able to obtain a jury "organized to return a verdict of death."

Regarding the first subpoint, the circuit court found that the jury had been death- and life-qualified through questioning by Taylor and through the jury questionnaire; it also found that each potential juror's view on the death penalty had been fully developed through the jury questionnaire and voir dire examination. The court also noted that the issue of whether the death penalty was automatic upon a guilt verdict for capital murder had been covered throughly with potential jurors through the use of a jury questionnaire, as well as through voir dire examination.

The jury questionnaire, which was prepared in collaboration by Taylor and the prosecutor, assessed potential jurors' feelings regarding imposition of the death penalty:

35. Which of the following statements best represents your feelings about the death penalty: (Circle)

    a. I believe that the death penalty should be imposed in all capital murder cases.

    b. I believe that the death penalty is appropriate in some capital murder cases, and I could return a verdict resulting in death in a proper case.

    c. Although I do not believe that the death penalty should ever be imposed, as long as the law provides for it, I could assess it under the proper set of circumstances.

    d. I believe that the death penalty is appropriate in some capital murder cases, but I could never return a verdict for the death penalty.

    e. I could never, under any circumstances, return a verdict for the death penalty.

    f. None of the above. My opinion is: _____.

Taylor testified that he thought the questionnaire covered the issue and that, as he recalled, the jurors who were picked to serve would have answered either (b) or (c) to number 35 on the questionnaire. Moreover, the State asked the jury as follows:

> [T]o sit on a jury you have to be what's called both life qualified and death qualified. . . . To make you life qualified, you can't sit on a jury if you think someone's guilty of capital murder they have to have the death penalty without regard to facts and a bunch of other things that are gonna come into play. Does anyone believe that someone should automatically have the death penalty if they are convicted of capital murder?

The State also noted that "the death penalty, even if he's convicted of capital murder, the death penalty is not an automatic thing." Taylor in turn asked the potential jurors, "And do you understand, each of you, that you can always vote not for the death penalty, does everyone understand that?" He further stated, "You can always vote not for death." In view of this evidence, we cannot conclude that the circuit court clearly erred in holding that counsel's performance was not ineffective because, in keeping with *Strickland*, Taylor's

SLIP OPINION

performance did not fall below an objective standard of reasonableness, nor did his performance so prejudice appellant's defense as to deprive him of a fair trial.

In his second subpoint, appellant argues that Taylor was ineffective in failing to attempt to rehabilitate four jurors who were struck for cause by the State. Specifically, appellant asserts that the prospective jurors did not "unequivocally state they would be unable to impose the death penalty"; rather, they "expressed mere general objections or religious scruples to the death penalty."

We disagree with appellant's characterization. During voir dire, juror Krauft stated, "I don't believe I could sentence anyone to the death penalty." Juror Swenson stated that she could not impose the death penalty. Juror Burnette stated that "it's not [her] place" to impose the death penalty. Juror Roberts stated that, in order to impose it, there would have to be "two or more witnesses" to the crime. Jurors Burnette and Roberts further indicated that they would not be able to impose the death penalty because of their personal beliefs. Taylor attempted to rehabilitate Juror Roberts by explaining that there would be no need for witnesses to the crime charged because there was no contest about who committed the murder. It appears from the record that Juror Roberts did not understand this concept, and the State's motion to excuse was granted after Taylor abandoned his attempt to rehabilitate Juror Roberts.

Appellant does not establish that Taylor's performance fell below an objective standard of reasonableness or that his performance so prejudiced appellant's defense as to deprive him

SLIP OPINION

of a fair trial. The remarks of the four prospective jurors indicate that none of them could impose the death penalty, and further, appellant has not shown that the four prospective jurors could have been rehabilitated or that the seated jury was biased. As discussed above, bare allegations of prejudice by counsel's conduct during voir dire that are unsupported by any showing of actual prejudice do not establish ineffective assistance of counsel. *Echols*, 354 Ark. at 556, 127 S.W.3d at 503.

In his fifth point on appeal, appellant argues that Taylor was ineffective in failing to inform the jury in his closing argument during the sentencing phase of trial that "mercy" could be given regardless of whether aggravating factors outweighed mitigating factors. Appellant asserts that "mercy" was not referenced by Taylor or by the circuit court in its jury instructions, and he argues in a conclusory fashion that prejudice in this instance is apparent. Appellant argues on appeal that Taylor was ineffective because he did not give additional instruction to the jury to more thoroughly inform it that "mercy" could be given by returning a sentence of life rather than death.

Appellant did not specifically raise a claim regarding a "mercy" instruction in his Rule 37.5 petition, and the circuit court did not address the issue in its order. Thus, as required by *Jones*, the record must conclusively demonstrate prejudice. Prior to closing arguments, during the sentencing phase of trial, the circuit court instructed the jury in accordance with AMI Crim. 2d 1008, which follows the language of Arkansas Code Annotated section 5-4-603(a) (Repl. 2013):

In no event will you return a verdict imposing the death penalty unless you unanimously make three particular findings on Form 3. These are: First, that the State has proved beyond a reasonable doubt one or more aggravating circumstances; second, such aggravating circumstances outweigh beyond a reasonable doubt any mitigating circumstances any of you found to exist; third, that the aggravating circumstances justify beyond a reasonable doubt the sentence of death. If you make those findings, you will impose the death penalty. Otherwise, you will sentence the Defendant to life imprisonment without parole.

Verdict Form 3, which follows the language of the statute and explains that each finding must be unanimous, was also given to the jury.

We have held that section 5-4-603(a) allows the jury to show mercy. *See, e.g.*, *Camargo v. State*, 337 Ark. 105, 108–09, 987 S.W.2d 680, 682–83 (1999). Mercy may be shown to the defendant by finding that the aggravating circumstances, even though they exist and outweigh the mitigating circumstances, do not justify imposition of the death sentence. *Id.* at 109, 987 S.W.2d at 683. Moreover, Taylor presented to the jury an argument for mercy, asserting that life imprisonment was sufficient punishment. Thus, the record does not, as required by *Jones*, conclusively demonstrate prejudice.

In his final point on appeal, appellant argues that the circuit court erred in failing to find that Taylor was ineffective for failing to investigate and call mitigation witnesses during the penalty phase of trial. Specifically, appellant asserts that Taylor was ineffective in failing to call seven additional witnesses: Joshua Beall, Hollie Knox, Chuck Ray, Jason Stephens, Jeremiah Estes, Laura Cotton, and Jessica Romine. Appellant contends that, had Taylor called these witnesses, the jury would have found mitigating circumstances relating to appellant's good work ethic as well as his gentleness, compassion, respectfulness, helpfulness, and concern

for and positive relationships with others. Appellant further contends that, but for Taylor's

failure to investigate and call the proposed witnesses during the sentencing phase of trial,

"there is a reasonable probability that at least one juror would have selected life."

In *Coulter v. State*, this court explained:

> The constitutional guarantee of effective assistance of counsel extends to the sentencing phase of the defendant's trial. Counsel's failure to investigate and present substantial mitigating evidence during the sentencing phase may constitute ineffective assistance of counsel. Counsel is obligated to conduct an investigation for the purpose of ascertaining mitigating evidence, and the failure to do so is error. Such error, however, does not automatically require reversal unless it is shown that, but for counsel's errors, there is a reasonable probability that the sentence would have been different. When reviewing a claim of ineffectiveness based upon failing to present adequate mitigating evidence, we must view the totality of the evidence—both that adduced at trial and that adduced in the postconviction proceeding.

343 Ark. 22, 29, 31 S.W.3d 826, 830 (2000) (internal citations omitted). An attorney's

decision to call a particular witness is largely a matter of professional judgment. *Id*. at 31, 31

S.W.3d at 832. Moreover, the failure to call witnesses whose testimony would be cumulative

to testimony already presented does not deprive the defense of vital evidence. *Id*. at 31, 31

S.W.3d at 832.

At the Rule 37.5 hearing, Taylor testified that he did not want to present a case that

appellant was mentally ill, depressed, and had trouble functioning in society while

simultaneously presenting a number of "friends" as mitigation witnesses. This testimony from

Taylor is in keeping with the December 1, 2008 letter from Taylor to appellant in which

Taylor explained that "there is a problem with putting your friends on in mitigation, as they

would essentially testify that they did not recognize that you were especially anxiety ridden

or depressed . . . contra to our position that we are advancing." He further wrote, "I don't want to get into a situation during mitigation where one group of witnesses is saying that you are a fine guy, who didn't seem to have any kind of emotional or mental problems, while another group of witnesses is saying you were suffering from both emotional and mental problems." He also wrote, "I believe the better strategy in this case is to continue along the path that we have previously picked out to advance the idea that you suffer from anxiety, depression, and that you have a borderline personality disorder."

The circuit court found that Taylor's decision not to call certain witnesses was part of his trial strategy and did not result in prejudice. In sum, Taylor's decision to not call the proposed witnesses who would have testified to appellant's mental stability was a matter of Taylor's professional judgment. Even though the jury was not persuaded by Taylor's trial tactics, we cannot say that the circuit court's findings were clearly erroneous or that Taylor's decisions fell below the wide range of reasonable professional assistance. Appellant further notes that other witnesses would have testified regarding his mental disease and defect. Taylor, however, presented evidence to that effect. Accordingly, additional witness testimony would have amounted to cumulative evidence; therefore, the failure to present these witnesses did not deprive the defense of vital evidence. Thus, as required by *Strickland*, appellant failed to show that Taylor's performance fell below an objective standard of reasonableness or that his performance so prejudiced appellant's defense as to deprive him of a fair trial.

Affirmed.

Cite as 2014 Ark. 268

Special Justice JAMES A. SIMPSON, JR., joins in this opinion.

GOODSON, J., not participating.

*James Law Firm*, by: *William O. "Bill" James, Jr.*, for appellant.

*Dustin McDaniel*, Att'y Gen., by: *Valerie Glover Fortner*, Ass't Att'y Gen., and *Kathryn Henry*, Ass't Att'y Gen., for appellee.