136 Nev., Advance Opinion 31

IN THE SUPREME COURT OF THE STATE OF NEVADA

| | |
|---|---|
| NORMAN DAVID BELCHER, JR.,<br>Appellant,<br>vs.<br>THE STATE OF NEVADA,<br>Respondent. | No. 72325<br><br>FILED<br><br>JUN 0 4 2020<br><br>ELIZABETH A. BROWN<br>CLERK OF SUPREME COURT<br>BY _____<br>CHIEF DEPUTY CLERK |



Appeal from a judgment of conviction, pursuant to a jury verdict, in a death penalty case. Eighth Judicial District Court, Clark County; Elissa F. Cadish, Judge.

*Affirmed in part and reversed in part.*

Christopher R. Oram Law Office and Christopher R. Oram, Las Vegas, for Appellant.

Aaron D. Ford, Attorney General, Carson City; Steven B. Wolfson, District Attorney, Krista D. Barrie, Chief Deputy District Attorney, and Giancarlo Pesci, Deputy District Attorney, Clark County, for Respondent.

BEFORE THE COURT EN BANC.[1]

_____

[1]The Honorable Jim C. Shirley, Judge of the Eleventh Judicial District Court, was designated by the Governor to sit in place of the Honorable Elissa F. Cadish, who is disqualified from participating in this matter. Nev. Const. art. 6, § 4(2).

20- 20941

*OPINION*

By the Court, HARDESTY, J.:

In this case, we conclude that the district court erred in denying a motion to suppress statements made by the appellant because he was in custody at the time and had not been advised of his rights as required by *Miranda v. Arizona*, 384 U.S. 436 (1966). That error does not require reversal of the judgment of conviction, however, if it was harmless. Although the State bears the burden of proving the error was harmless, the State made no effort to meet that burden in its appellate brief filed in this case. We can treat the State's failure to argue harmlessness as a waiver of the issue or a confession that the error was not harmless, as we did in *Polk v. State*, 126 Nev. 180, 233 P.3d 357 (2010). But because there may be extraordinary cases in which no interest would be served by reversing a judgment of conviction without considering harmlessness, we take this opportunity to adopt three factors to help determine whether we should consider an error's harmlessness when the State has not argued harmlessness in a death penalty case. Those factors are the length and complexity of the record, the certainty that the error is harmless, and the futility and costliness of reversal and further litigation. After weighing those factors, we conclude that sua sponte harmless-error review is appropriate in this matter and that the complained-of error is harmless. We also conclude that one of the convictions for robbery was not supported by sufficient evidence and therefore reverse that conviction. Because no other issue warrants relief, we affirm the judgment of conviction in all other respects.




## FACTS

William Postorino sold drugs and forged prescriptions, recruiting people, including appellant Norman Belcher, to fill prescriptions and furnish him with drugs for resale. In early December 2010, Belcher purchased prescriptions from William, but he could not fill them. Belcher demanded that William return the money he paid for some of the prescriptions. After a series of threatening text messages from Belcher, William returned the money and ended his business relationship with Belcher.

Not long after the disagreement between William and Belcher, an armed intruder kicked in the front door of William's home at 2:30 in the morning. William was not home, but his 15-year-old daughter Alexus, roommate Nick Brabham, and Nick's friend Ashley Riley were there. When Nick responded to the forced entry, he was shot in the abdomen. Nick fell down and pulled himself into a closet. The intruder then shot Alexus several times. Ashley managed to escape, jumping out of a second-story window. The intruder took property from the home, including a laptop, safe, and 60-inch television. Nick survived his injuries, but Alexus succumbed to hers.

William's neighbors observed a man outside the residence before the shooting, and then again after the shooting, loading objects, including a heavy metal object, into a white car. A rented white Nissan Versa was stopped for speeding about 18 miles from William's home at 3:16 on the morning of the break-in and shooting. The driver, later identified as Belcher, was ticketed and allowed to leave. Several hours later, the Versa was set on fire. Video of the area showed Belcher walking away from the

burning car. Nick identified Belcher as the shooter about a month after the shooting, when he emerged from a coma.

According to Belcher's romantic partner, Bridgette Chaplin, Belcher made comments before the shooting that suggested his motive to shoot Alexus—revenge against William. He also told Bridgette that burning evidence was one of the best ways to get rid of it. When he was being booked into jail, Belcher suggested his involvement in Alexus' killing, asking an officer if the jail would "put [him] in max custody because [he] killed a kid?"

A jury found Belcher guilty of two counts of robbery with the use of a deadly weapon and one count each of burglary while in possession of a firearm, murder with the use of a deadly weapon, attempted murder with the use of a deadly weapon, battery with the use of a deadly weapon causing substantial bodily harm, and third-degree arson. The jury sentenced him to death for the murder. This appeal followed.

## DISCUSSION

### Admissibility of Belcher's statement to police

Belcher argues that the district court erred in denying his motion to suppress the statements he made during an interview with detectives before his arrest. He asserts that he was in custody at the time and therefore entitled to warnings pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966).

"*Miranda* establishes procedural safeguards 'to secure and protect the Fifth Amendment privilege against compulsory self-incrimination during the inherently coercive atmosphere of an in-custody interrogation.'" *Stewart v. State*, 133 Nev. 142, 146, 393 P.3d 685, 688 (2017) (quoting *Dewey v. State*, 123 Nev. 483, 488, 169 P.3d 1149, 1152

(2007)). If a person is not advised of his or her *Miranda* rights, any statements made during a custodial interrogation are inadmissible at trial, *Carroll v. State*, 132 Nev. 269, 282, 371 P.3d 1023, 1032 (2016), except to impeach his or her inconsistent trial testimony, *Lamb v. State*, 127 Nev. 26, 36, 251 P.3d 700, 707 (2011). There is no dispute that Belcher was not given the *Miranda* warnings before he was interviewed, so the only question is whether Belcher was in custody during the interview.

"A defendant is 'in custody' under *Miranda* if he or she has been formally arrested or his or her freedom has been restrained to 'the degree associated with a formal arrest so that a reasonable person would not feel free to leave.'" *Carroll*, 132 Nev. at 282, 371 P.3d at 1032 (quoting *State v. Taylor*, 114 Nev. 1071, 1082, 968 P.2d 315, 323 (1998)). Whether a defendant is in custody is determined by the totality of the circumstances. *Id.* Those circumstances include the interrogation site, any objective indicia of arrest, "and the length and form of questioning." *Id.* (internal quotation marks omitted). Based on our review of the record and giving deference to the district court's relevant factual findings that are supported by the record, we conclude that Belcher was in custody when detectives interrogated him and therefore the district court erred in denying the motion to suppress and the motion to reconsider that decision. *Id.* at 281, 371 P.3d at 1031 (explaining that the custody determination presents a mixed question of law and fact, so the appellate court will give deference to the district court's findings of historical facts if they are supported by the record but will review de novo the district court's conclusion as to custody).

*Site of interrogation*

The first factor—the site of the interrogation—indicates that Belcher was in custody during the interview. Detectives transported Belcher to the homicide offices and questioned him in an interview room.

Although the location of the interview at the homicide offices does not definitively establish that Belcher was in custody, *see California v. Beheler*, 463 U.S. 1121, 1125 (1983) (holding that an interrogation is not necessarily custodial because it occurred at a police station), it is suggestive of custody considering the other circumstances related to the location, *see Carroll*, 132 Nev. at 282, 371 P.3d at 1032 (recognizing that a suspect who is driven to the interview site could not terminate the interview). The detectives chose to transport Belcher to the homicide offices for the interview when they could have questioned him in a less intimidating location. By transporting Belcher to the homicide offices, the detectives made it more difficult for Belcher to leave without their assistance. The environment in the interview room further conveyed that Belcher was not free to leave. For example, when the detectives spoke with Belcher, they sat in front of the only door to the room, such that Belcher could not terminate the interview or leave the room unless the detectives moved and allowed him to do so. *Cf. id.* (recognizing a defendant was in custody where two detectives sat between the defendant and the sole door to a very small room). And when detectives left the room, they locked the door behind them. Considering all of the circumstances surrounding the site of the interrogation, we conclude they suggest that Belcher was in custody.

*Objective indicia of arrest*

The second factor—objective indicia of arrest—also indicates that Belcher was in custody when he made his statements. Objective indicia of arrest include the following:

> (1) whether the suspect was told that the questioning was voluntary or that he was free to leave; (2) whether the suspect was not formally under arrest; (3) whether the suspect could move about freely during questioning; (4) whether the

suspect voluntarily responded to questions; (5) whether the atmosphere of questioning was police-dominated; (6) whether the police used strong-arm tactics or deception during questioning; and (7) whether the police arrested the suspect at the termination of questioning.

*Taylor*, 114 Nev. at 1082 n.1, 968 P.2d at 323 n.1. Not all of these factors need be present to make a determination as to custody. *Id.* With the exception of being placed under formal arrest before the interview, all the objective indicia of arrest are present in this case.

First, the detectives' actions suggested that Belcher was not free to leave. Detectives approached Belcher outside his apartment and handcuffed him. He was detained in handcuffs for approximately 10 to 15 minutes before another set of detectives asked him to come to their office to answer questions. Belcher remained in handcuffs for the 30-minute ride in the police vehicle. The detectives never told him that he was free to decline accompanying them or to leave the interview.

Second, as previously discussed, detectives restricted Belcher's movement during questioning. They questioned Belcher in a room that was approximately the size of the trial court's witness stand. While they questioned him, the two detectives sat between Belcher and the interview room door. He could not leave unless the officers stood, moved aside, and allowed him to do so. Although not handcuffed in the room, he was either flanked by the detectives or locked in the room alone. The State has suggested that Belcher was not precluded from using his cell phone, an apparent effort to distinguish the circumstances from those in *Carroll*. That effort falls flat given evidence in the record that Belcher did not have possession of his cell phone during the interview, as it was found during the search of his apartment. Instead, the record indicates Belcher perceived

that his freedom of movement was limited—for example, he sought permission to reach inside his pockets. The circumstances and the environment in the interview room described above further reflect the interview's police-dominated atmosphere.

Third, Belcher initially declined to discuss certain topics, such as his drug dealing and whether he had been upstairs in William's home. Detectives pressed the second topic and eventually compelled an answer. They also employed a measure of deception by insisting that Belcher had already been identified by a patrol officer when the identification did not occur until after the interview. Thus, it is not clear that all of Belcher's responses were voluntary.

Lastly, Belcher was arrested at the end of the interview. When the interview ceased and Belcher asked to leave, detectives insisted that they would release him in ten minutes. They instead left him sitting in the interview room for approximately an hour, until the patrol officer who pulled over the white Versa on the night of the shooting arrived for a show-up identification. Belcher was arrested after the officer identified him as the driver he pulled over in the white Versa.

In sum, all but one of the seven objective indicia of arrest weigh in favor of concluding that Belcher was in custody. The detectives' subjective motivation for handcuffing Belcher (officer safety) and locking him in the interview room (to prevent him from wandering around the homicide offices) and their subjective intention with respect to the techniques they employed are not relevant because "whether a suspect is 'in custody' is an *objective* inquiry." *J.D.B v. North Carolina*, 564 U.S. 261, 270 (2011) (emphasis added). Here, the *objective* indicia of arrest suggest that Belcher was in custody during the interrogation.

 

*Length and form of questioning*

The third factor—length and form of the questioning—also indicates that Belcher was in custody. Although detectives questioned Belcher for a little under an hour, he was in the interview room for three and one-half hours. Detectives did not immediately start questioning him and took breaks during the questioning. While the amount of time spent on questioning might not alone suggest that Belcher was in custody, *cf. Carroll*, 132 Nev. at 285, 371 P.3d at 1034 (concluding that questioning of two and one-half hours, excluding breaks, militated toward finding that suspect was in custody), Belcher was left in the locked interview room for another hour after the interview, even though he had asked to leave at the end of the interview and had been told that he would be able to leave in about ten minutes. Additionally, detectives questioned Belcher as a suspect, not as a witness. The questioning was focused on where Belcher was on the evening of the shooting and his conflict with William. Detectives also pressed him on issues he was initially reluctant to talk about, employed deception during the interview, and repeatedly confronted him with evidence that conflicted with his answers.

Considering the totality of the circumstances, Belcher was in custody when detectives interviewed him. And with no *Miranda* warnings issued, we conclude that the district court erred in denying the motion to suppress and the motion to reconsider its decision.

*Harmless-error review*

When an appellant demonstrates error of a constitutional nature, as Belcher has done here, we must reverse unless the error was harmless beyond a reasonable doubt. *See* NRS 178.598; *Obermeyer v. State*, 97 Nev. 158, 159, 625 P.2d 95, 96 (1981); *see also Chapman v. California*, 386 U.S. 18, 24 (1967). The State bears the burden of proving that the error

was harmless—i.e., that the error did not contribute to the verdict. *See Chapman*, 386 U.S. at 24. It follows that the State forfeits the opportunity to satisfy that burden if it fails to address harmlessness. *See Polk v. State*, 126 Nev. 180, 184-86, 233 P.3d 357, 359-61 (2010); *cf.* NRAP 31(d)(2) ("The failure of respondent to file a brief may be treated by the court as a confession of error . . . ."). Here, the State made no argument as to harmlessness. Accordingly, we may treat that omission as a waiver of the issue or confession that the error was not harmless. Doing so "makes perfect sense in light of the nature of the harmless-error inquiry: it is the [State's] burden to establish harmlessness, and it cannot expect us to shoulder that burden for it." *United States v. Gonzalez-Flores*, 418 F.3d 1093, 1100 (9th Cir. 2005).

This court has not addressed, however, whether there are circumstances in which we will consider harmlessness even though the State has not argued it, aside from observations in *Polk* about insignificant issues or excusable neglect. *See Polk*, 126 Nev. at 185, 233 P.3d at 360. A number of federal circuit courts of appeal have recognized they have discretion to consider whether an error was harmless under certain circumstances regardless of whether the government has argued harmlessness. *See, e.g., United States v. Rodriguez*, 880 F.3d 1151, 1164 (9th Cir. 2018); *United States v. Rose*, 104 F.3d 1408, 1414 (1st Cir. 1997); *Horsley v. Alabama*, 45 F.3d 1486, 1492 n.10 (11th Cir. 1995); *United States v. Langston*, 970 F.2d 692, 704 n.9 (10th Cir. 1992); *Lufkins v. Leapley*, 965 F.2d 1477, 1481 (8th Cir. 1992); *United States v. Pryce*, 938 F.2d 1343, 1348 (D.C. Cir. 1991); *United States v. Giovannetti*, 928 F.2d 225, 227 (7th Cir. 1991). In doing so, they primarily rely "on the arguably mandatory language" in the federal harmless-error rule providing that error that "does

not affect substantial rights *shall be disregarded.*" *Rose*, 104 F.3d at 1414 (emphasis added) (internal quotation marks omitted) (referencing former version of rule).[2] Nevada's statutory definition of harmless error includes the same "arguably mandatory language[:]" "Any error, defect, irregularity or variance which does not affect substantial rights *shall be* disregarded." NRS 178.598 (emphasis added). Given that similarity, we agree with the federal courts and thus take this opportunity to hold that Nevada's appellate courts *may* overlook the State's omission and consider harmlessness sua sponte.

But like the federal courts, we will overlook the State's failure to argue harmlessness only in "extraordinary cases" because "there are good policy reasons not to do so" at all. *Rodriguez*, 880 F.3d at 1163-64 (internal quotation marks omitted). Chief among those reasons is fairness. As the United States Court of Appeals for the Ninth Circuit has observed, considering harmless error where the government has not raised it "may unfairly tilt the scales of justice by authorizing courts to construct the government's best arguments for [harmlessness] without providing the defendant with a chance to respond." *Gonzalez-Flores*, 418 F.3d at 1101. Nor do we want "to encourage the government's laxness and failure to follow . . . clear, applicable precedent" assigning it the burden of establishing harmlessness. *Rodriguez*, 880 F.3d at 1163 (internal quotation marks omitted). And not to be overlooked is the impact on the reviewing court, which would be obligated to expend its limited resources "search[ing]

---

[2]Currently, Fed. R. Crim. P. 52(a) states, "Any error, defect, irregularity, or variance that does not affect substantial rights must be disregarded."

SUPREME COURT
OF
NEVADA

(O) 1947A

11

through large records without guidance from the parties." *Gonzalez-Flores*, 418 F.3d at 1100.

To help identify the exceptional case in which the court may consider harmlessness when the State has not argued it, we adopt the test employed by the federal circuit courts. Accordingly, we will look to three factors in deciding whether to consider an error's harmlessness sua sponte: "(1) the length and complexity of the record, (2) whether the harmlessness of an error is certain or debatable, and (3) the futility and costliness of reversal and further litigation." *Rodriguez*, 880 F.3d at 1164 (internal quotation marks omitted); *see also United States v. McLaughlin*, 126 F.3d 130, 135 (3d Cir. 1997), *abrogated on other grounds by United States v. Fiorelli*, 133 F.3d 218 (3d Cir. 1998); *Giovannetti*, 928 F.2d at 227. *But see Rose*, 104 F.3d at 1415 (rejecting test and considering "the balancing of many elements"). Of those factors, the second one—the court's certainty as to the error's harmlessness—is most sensitive to the concerns of considering an error's harmlessness notwithstanding the State's failure to argue it. *Gonzalez-Flores*, 418 F.3d at 1101. In particular, when the error's harmlessness "is at all close, defense counsel's lack of opportunity to answer potential harmless error arguments may lead the court to miss an angle that would have shown the error to have been prejudicial." *Id.* (quoting *Pryce*, 938 F.2d at 1347). The second factor therefore is the most important. *United States v. Brooks*, 772 F.3d 1161, 1171 (9th Cir. 2014). Thus, "[i]f the harmlessness of the error is at all debatable, prudence and fairness to the defendant counsel against deeming that error harmless without the benefit of the parties' debate." *Gonzalez-Flores*, 418 F.3d at 1101. Applying the factors here, we conclude sua sponte review is warranted and the error in admitting Belcher's statement was harmless.

The record here is voluminous. The guilt phase of trial lasted nearly three weeks and included testimony from three dozen witnesses. The witnesses provided eyewitness, scientific, financial, and investigative testimony. But whether unbriefed harmlessness review unduly burdens this court does not directly correlate to the overall size of the record. In fact, most of the record is irrelevant to the harmless-error review at issue. In particular, we do not need to consider the lengthy parts of the record devoted to charging proceedings, pretrial motion practice, and discovery to determine whether the admission of Belcher's statement was harmless. Nor do we need to consider the whole of the trial transcript. For example, the transcripts of jury selection and the penalty phase proceedings offer no insight into whether the admission of Belcher's statement was harmless to the guilt phase verdict. When the record is narrowed down to the relevant parts of the guilt phase transcripts, sua sponte review for harmlessness is much less burdensome. And because we are already obligated to afford "extra resources and heightened scrutiny" to death penalty cases, *see Evans v. State*, 117 Nev. 609, 642, 28 P.3d 498, 520 (2001) ("SCR 250 and the internal policies of this court ensure that [death penalty] cases receive extra resources and heightened scrutiny."), *overruled on other grounds by Lisle v. State*, 131 Nev. 356, 366 n.5, 351 P.3d 725, 732 n.5 (2015), the record's size is not a compelling factor in deciding whether to conduct sua sponte harmless-error review in this capital case.

We are also certain that the error was harmless beyond a reasonable doubt. Belcher did not confess during the custodial interview, nor did his statements lead detectives to evidence implicating him in the crimes. At most, the jury could infer consciousness of guilt when Belcher tried to concoct an alibi and lied about the traffic stop and the fate of his

rental car. But there was other, significantly more compelling evidence against Belcher. Nick identified Belcher as the man who shot him. Evidence established the disintegration of William and Belcher's illicit business relationship, including a heated disagreement between the two men regarding a drug debt close in time to the shooting. And Belcher openly contemplated harming William's 15-year-old daughter as revenge. Eyewitness testimony placed a white car at the scene of the shooting, and minutes after the shooting, a patrol officer stopped Belcher for speeding in the white rental car that, two hours later, was set on fire and destroyed. The defense even *admitted* that Belcher committed third-degree arson. And when Belcher was booked into the jail, he made an unsolicited comment to one of the correctional officers that seemingly acknowledged he killed Alexus: "[S]ir, are you . . . going to put me in max custody because I killed a kid?" In this context, Belcher's statement was cumulative and much weaker than other evidence of his guilt.

When the totality of the other evidence of Belcher's guilt is considered against the contrastingly weak and cumulative consciousness of guilt exhibited in Belcher's statement, there can be no debate that a rational jury would have found Belcher guilty with or without his statement to the police. Given this, it would be futile to reverse and remand because another trial would reach the same result. *See Brooks*, 772 F.3d at 1172 (concluding that remand for retrial would be futile where there is overwhelming evidence of guilt). And considering that the original trial lasted about three weeks and involved dozens of witnesses, reversal and remand for another trial would be costly both in terms of the expense and impact on the lower court's docket and imposition on the victims and their families. *See Giovannetti*, 928 F.2d at 227 (recognizing that when considering the impact

SUPREME COURT
OF
NEVADA

(O) 1947A

14

a lengthy retrial would have on litigants in other cases due to the strain on judicial resources, "reversal may be an excessive sanction for the government's having failed to argue harmless error, at least if the harmlessness of the error is readily discernible without an elaborate search of the record").

Having considered the factors adopted today, we conclude that applying a sua sponte harmlessness review to the relevant portions of the record in this case demonstrates that the error was harmless and that a new trial will undoubtedly end in the same result.

*Conflict of interest*

Belcher argues that the district court erred in denying his motion to dismiss based on an alleged conflict of interest. He asserts that one of his attorneys, Lance Maningo, defended Nick on unrelated drug charges and declined to cross-examine Nick at the preliminary hearing due to the prior relationship.

A conflict of interest exists where "counsel 'actively represent[s] conflicting interests.'" *Strickland v. Washington*, 466 U.S. 668, 692 (1984) (quoting *Cuyler v. Sullivan*, 446 U.S. 335, 350 (1980)); *see also Clark v. State*, 108 Nev. 324, 326, 831 P.2d 1374, 1376 (1992) ("In general, a conflict exists when an attorney is placed in a situation conducive to divided loyalties." (quoting *Smith v. Lockhart*, 923 F.2d 1314, 1320 (8th Cir. 1991))). We discern no such conflict here. At the time of the preliminary hearing, Maningo did not recall that he had represented Nick. Because he was unaware of the prior representation, it cannot be said that the prior representation adversely affected his performance at the preliminary hearing. But more importantly, Maningo's co-counsel made the decision not to cross-examine Nick for reasons that were unrelated to and were not

influenced by Maningo's former representation of Nick. We therefore conclude that Belcher did not demonstrate that an actual conflict adversely affected his attorney's performance. *Cuyler*, 446 U.S. at 348 n.14. Accordingly, the district court did not err in denying the motion to dismiss. *See Lader v. Warden*, 121 Nev. 682, 686, 120 P.3d 1164, 166 (2005) (explaining that questions as to counsel's performance "present[ ] a mixed question of law and fact that is subject to independent review").

*Apartment search*

Belcher argues that the district court erred in denying his motion to suppress evidence seized from his apartment because police entered the apartment before the warrant issued. We disagree.

The facts adduced at the suppression hearing established that officers took Belcher's keys and entered his apartment when they detained him before obtaining a search warrant. Although "[w]arrantless searches and seizures in a home are presumptively unreasonable," *Doleman v. State*, 107 Nev. 409, 413, 812 P.2d 1287, 1289 (1991); *see also* U.S. Const. amend. IV, a prior unauthorized entry does not necessitate the suppression of evidence where there is an independent source for the information supporting the warrant. *Segura v. United States*, 468 U.S. 796, 813-14 (1984). Here, while the officers initially entered Belcher's apartment before obtaining the warrant, the search and processing of the apartment did not begin until after the warrant issued. The warrant application did not contain any information discovered during the unauthorized entry but instead relied on evidence of the purported debt and animus between Belcher and William, reports of a car similar to Belcher's rental car seen at the home around the time of the shooting, evidence that Belcher was driving his rental car shortly after the shooting, and evidence that Belcher's rental

SUPREME COURT
OF
NEVADA

(0) 1947A

car was later set on fire. Therefore, the district court did not err in denying the motion to suppress.

*Out-of-court identifications*

Belcher argues that the district court erred in denying his motion to exclude two witnesses' identifications of him because the procedures used were unnecessarily suggestive. Although we agree that the procedures employed were unnecessarily suggestive, we conclude that the district court did not err because the identifications nonetheless were reliable.

The pretrial identification procedures employed with Nick and Officer Cavaricci were unnecessarily suggestive. *See Banks v. State*, 94 Nev. 90, 94, 575 P.2d 592, 595 (1978) (considering whether identification procedure "was so unnecessarily suggestive and conducive to irreparable mistaken identification that [appellant] was denied due process of law" (alteration in original) (quoting *Stovall v. Denno*, 388 U.S. 293, 302 (1967))). Nick was presented with a photographic lineup that conspicuously highlighted a comparatively unique trait of Belcher's in contrast with the other subjects. *See Simmons v. United States*, 390 U.S. 377, 383 (1968) (recognizing that photographic lineup may result in incorrect identification where photograph of individual "is in some way emphasized"). Belcher, an African American with a lighter complexion and light hair, was displayed in a photograph lineup in which he was the only subject without dark hair. And Officer Cavaricci viewed Belcher in the interview room at the homicide office, which was "inherently suggestive because it is apparent that law enforcement officials believe[d] they [had] caught the offender." *Jones v. State*, 95 Nev. 613, 617, 600 P.2d 247, 250 (1979).

Nevertheless, both identifications were reliable despite the suggestive procedures. *Banks*, 94 Nev. at 94, 575 P.2d at 595 (recognizing that identification made from a suggestive procedure is nevertheless admissible when the identification is reliable). Nick's identification was reliable because he had identified Belcher by name and described his features *before* officers presented him with the photo array. Officer Cavaricci's identification was reliable because he had a significant opportunity to view Belcher during the traffic stop, observing Belcher from a distance of about three feet for approximately ten minutes; he had to verify that Belcher matched the driver's license picture that Belcher provided; he identified Belcher in the show-up identification less than 24 hours after the traffic stop; and he immediately identified Belcher, stating that he was certain Belcher was driving the vehicle he stopped for speeding. *See Gehrke v. State*, 96 Nev. 581, 584, 613 P.2d 1028, 1030 (1980) (considering witness's opportunity to view the criminal, degree of attention, accuracy of prior description, level of certainty at the identification, and time between crime and identification in determining reliability of identification). Considering these facts, the district court did not err in denying the motion.

*Failure to preserve exculpatory evidence*

Belcher argues that the district court should have granted his motion to dismiss the charges based on the State's failure to collect William Postorino's cell phone. He alleges that a text message exchange on the phone would have refuted the motive asserted by the State as it would have showed the drug debt had been settled. We conclude that Belcher did not make the required showing to warrant dismissal and therefore the district court did not err.

"[P]olice officers generally have no duty to collect all potential evidence from a crime scene." *Daniels v. State*, 114 Nev. 261, 268, 956 P.2d 111, 115 (1998) (quoting *State v. Ware*, 881 P.2d 679, 684 (N.M. 1994)). To demonstrate a due process violation based on the failure to gather evidence, a defendant must show "a reasonable probability that, had the evidence been available to the defense, the result of the proceedings would have been different." *Id.* at 267, 956 P.2d at 115. If that showing is made, the appropriate sanction depends on "whether the failure to gather evidence was the result of mere negligence, gross negligence, or a bad faith attempt to prejudice the defendant's case." *Id.* There is no indication from the record, beyond Belcher's bare assertion, that the phone contained additional messages other than those the detectives had memorialized. Even assuming such messages existed, Belcher did not demonstrate a reasonable probability that the result of the trial would have been different had the phone been seized, as William testified that he had paid Belcher to settle the dispute. And we further agree with the district court that Belcher also did not show that officers acted in bad faith, a required showing to warrant dismissal. *Id.*

*Aiding and abetting theory of guilt*

Belcher asserts that the district court erred in declining to strike the State's aiding and abetting theory of guilt and instructing the jury on aiding and abetting liability. We disagree.

As some evidence adduced during the preliminary hearing suggested more than one individual was involved in the burglary and shootings, Belcher did not demonstrate that the district court should have struck the aiding and abetting allegations from the information. *See Sheriff v. Potter*, 99 Nev. 389, 391, 663 P.2d 350, 352 (1983) ("Probable cause to

support an information may be based on slight, even 'marginal' evidence." (quoting *Sheriff v. Lyons*, 96 Nev. 298, 299, 607 P.2d 590, 591 (1980) (internal quotation marks omitted))). To the extent that Belcher relies on *Barren v. State*, 99 Nev. 661, 669 P.2d 725 (1983), to suggest that the district court should have struck the aiding and abetting theory because it was not adequately pleaded, that argument lacks merit. Belcher did not ask that the State be required to amend the information to allege specific facts related to the aiding and abetting theory. *See id.* at 669-70, 669 P.2d at 729-30. And even if the information did not include specific factual allegations as to the means of aiding and abetting, Belcher was not prejudiced because the State proceeded at trial based solely on the theory that Belcher acted alone in the burglary, shooting, and robberies. *See Randolph v. State*, 117 Nev. 970, 978, 36 P.3d 424, 429 (2001) ("[O]ur holding in *Barren* was aimed at preserving due process by preventing the prosecution from concealing or vacillating in its theory of the case to gain an unfair advantage over the defendant.").

*Prior bad acts*

Belcher argues that the district court erred in admitting testimony about a prior burglary accusation against him and that he contemplated harming one of the victims and in excluding evidence of a home invasion committed by another suspect. We disagree.

Belcher did not object to the witnesses' testimony about the prior burglary, which would normally invoke plain-error review. *See Green v. State*, 119 Nev. 542, 545, 80 P.3d 93, 94-95 (2003) (reviewing unobjected-to error for plain error affecting a defendant's substantial rights). But here, Belcher waived any argument that the evidence was inadmissible under NRS 48.045(2) when the parties agreed at a pretrial hearing to the

admission of evidence about Belcher's history of drug dealing with William and the accusation that Belcher committed the uncharged burglary. As to Belcher's conversation with Bridgette, it was not a bad act inadmissible under NRS 48.045(2). Rather, Belcher's statement to Bridgette was relevant as it reflected his animosity toward William and intent to hurt William by harming his child, *see* NRS 48.015 (defining "relevant evidence"), and was admissible against him even though it was an out-of-court statement, *see* NRS 51.035(3)(a) (recognizing that a party's own statement is not hearsay when it is offered against him). Finally, the district court did not abuse its discretion in excluding the alternative suspect's criminal record. *See Newman v. State*, 129 Nev. 222, 231, 298 P.3d 1171, 1178 (2013) (stating that district court's decision to admit or exclude prior-bad-act evidence is subject to review for an abuse of discretion). That evidence was not admissible to prove that the other suspect committed the burglary and shooting, NRS 48.045(1), and Belcher has not alleged sufficient circumstances indicating that the evidence would have been admissible pursuant to an exception under NRS 48.045(2).

*Witness vouching*

Belcher argues that the district court erred in allowing Detective Teresa Mogg to vouch for the credibility of Ashley's statement to police. We conclude that this contention lacks merit.

"A witness may not vouch for the testimony of another." *Farmer v. State*, 133 Nev. 693, 705, 405 P.3d 114, 125 (2017) (internal quotation marks omitted). During cross-examination by the State, Detective Mogg arguably vouched for the veracity of Ashley's statement when she testified that she was skeptical about Ashley's statement at first but believed her by the end of the interview. Belcher did not object to this testimony, such that

SUPREME COURT
OF
NEVADA

(O) 1947A

21

we normally would review for plain error. *See Green*, 119 Nev. at 545, 80 P.3d at 94-95. But here, even plain-error review is not warranted considering defense counsel's direct examination of Detective Mogg. When defense counsel questioned Detective Mogg about Ashley's statement to her, he specifically broached the subject of whether Detective Mogg was skeptical of Ashley's statement that her boyfriend, another suspect considered by police, would not have been upset by her spending time with Nick. Detective Mogg responded that the skepticism she displayed during the interview was intended to coax more information out of Ashley. This line of inquiry by defense counsel provoked the State to cross-examine Detective Mogg about the skepticism she expressed during the interview with Ashley, which led to Detective Mogg's testimony that she believed Ashley by the end of the interview. Belcher thus invited the testimony he now challenges as error. *See Pearson v. Pearson*, 110 Nev. 293, 297, 871 P.2d 343, 345 (1994) (recognizing that invited error occurs when a party appeals an error "which he himself induced or provoked the court or the opposite party to commit" (internal quotation marks omitted)). As such, he cannot complain about it on appeal. *Id.*

*Hearsay*

Belcher argues that the district court erred in admitting hearsay evidence in violation of the Confrontation Clause. He did not object below, and we discern no plain error. *See Green*, 119 Nev. at 545, 80 P.3d at 94-95. A review of the record reveals that Detective Ken Hardy's testimony that a possible suspect told him that he was home at the time of the shooting was not offered to prove the truth of that statement and thus was not hearsay. Instead, the testimony, which was accompanied by testimony that the investigation did not reveal any connections between

that suspect and Alexus, explained why detectives did not investigate the suspect further. Detective Hardy's testimony therefore was not hearsay. NRS 51.035 (providing that hearsay is an out-of-court statement offered "to prove the truth of the matter asserted"); *United States v. Holmes*, 620 F.3d 836, 841 (8th Cir. 2010) (holding course-of-investigation evidence admissible to explain a police investigation "when the propriety of the investigation is at issue in the trial"); *Wallach v. State*, 106 Nev. 470, 473, 796 P.2d 224, 227 (1990) (similar). And because "[t]he [Confrontation] Clause also does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted," *Crawford v. Washington*, 541 U.S. 36, 59 n.9 (2004), there was no confrontation violation either.

*Sufficiency of the evidence of robbery*

Belcher argues that the State produced insufficient evidence to support his conviction for robbing Nick of his laptop and wallet. We agree.

In reviewing a challenge to the sufficiency of the evidence supporting a criminal conviction, we consider "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *McNair v. State*, 108 Nev. 53, 56, 825 P.2d 571, 573 (1992) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). The State alleged that Belcher committed robbery by taking Nick's laptop and wallet after shooting him. *See* NRS 200.380(1) (defining robbery as "the unlawful taking of personal property from the person of another, or in the person's presence, against his or her will, by means of force or violence or fear of injury"). Unlike other valuable property taken from the home, Nick's laptop and wallet remained in the home. While processing the scene, officers found

both items in William's room. And there were conflicting accounts of where Nick's property had been before the shooting. Given that the property was found in the home and the conflicting accounts of where in the home that property was before the shooting, we are not convinced that, even viewing the evidence in the light most favorable to the State, a rational trier of fact could find beyond a reasonable doubt the unlawful taking of the laptop and wallet. *See Litteral v. State*, 97 Nev. 503, 506-08, 634 P.2d 1226, 1227-29 (1981) (discussing the "unlawful taking" element of robbery), *disapproved of on other grounds by Talancon v. State*, 102 Nev. 294, 721 P.2d 764 (1986). Accordingly, we reverse the conviction for robbery related to Nick's laptop and wallet (count 2).

*Guilt phase jury instructions*

Belcher argues that the district court erred in giving several jury instructions. Specifically, he contends that the implied malice instruction used archaic language, the premeditation instruction was vague and did not differentiate the elements of first- and second-degree murder, the reasonable doubt instruction improperly minimized the State's burden of proof, and the equal and exact justice instruction was confusing. Belcher did not object below and we discern no plain error. *See* NRS 178.602; *Green*, 119 Nev. at 545, 80 P.3d at 94-95. This court has upheld the language used in the implied malice instruction, *Leonard v. State*, 117 Nev. 53, 78-79, 17 P.3d 397, 413 (2001) (the statutory language of implied malice is well established in Nevada and accurately informs the jury of the distinction between express and implied malice); *Cordova v. State*, 116 Nev. 664, 666, 6 P.3d 481, 483 (2000) (the substitution of the word "may" for "shall" in an implied malice instruction is preferable because it eliminates the mandatory presumption); the premeditation instruction, *see Byford v. State*, 116 Nev. 215, 236-37, 994 P.2d 700, 714-15 (2000); and the equal and exact

justice instruction, *see Thomas v. State*, 120 Nev. 37, 46, 83 P.3d 818, 824-25 (2004); *Daniel v. State*, 119 Nev. 498, 522, 78 P.3d 890, 906 (2003); *Leonard v. State*, 114 Nev. 1196, 1209, 969 P.2d 288, 296 (1998). In addition, the district court gave Nevada's statutory reasonable doubt instruction as set forth in and mandated by NRS 175.211, and we have repeatedly upheld the constitutionality of that instruction. *See Garcia v. State*, 121 Nev. 327, 340 & n.26, 113 P.3d 836, 844 & n.26 (2005) (collecting cases), *modified on other grounds by Mendoza v. State*, 122 Nev. 267, 130 P.3d 176 (2006).

*Ineffective assistance of trial counsel*

Belcher argues that his trial counsel introduced inappropriate and highly prejudicial expert psychological testimony during the penalty hearing. Relying on *Mazzan v. State*, 100 Nev. 74, 675 P.2d 409 (1984), and *McCoy v. Louisiana*, 584 U.S. ___, 138 S. Ct. 1500 (2018), Belcher contends that counsel's ineffectiveness is clear from the record before this court.

"[W]e have generally declined to address claims of ineffective assistance of counsel on direct appeal unless there has already been an evidentiary hearing or where an evidentiary hearing would be unnecessary." *Pellegrini v. State*, 117 Nev. 860, 883, 34 P.3d 519, 534 (2001) (footnote omitted), *abrogated on other grounds by Rippo v. State*, 134 Nev. 411, 423 n.12, 423 P.3d 1084, 1097 n.12 (2018); *see also United States v. Daychild*, 357 F.3d 1082, 1095 (9th Cir. 2004). Neither exception applies in this case. The district court did not evaluate this claim in an evidentiary hearing. And counsel's decision to introduce expert psychological evidence is not so apparently deficient from a review of the record that we could conclude that an evidentiary hearing is unnecessary or that the record has been sufficiently developed rendering an evidentiary hearing unnecessary.

*Cf. Mazzan*, 100 Nev. at 80, 675 P.2d at 413 (concluding based on record on direct appeal that counsel's performance "exceeded the outer parameters of effective advocacy" and that defendant would have been better served without counsel). In addition, Belcher's reliance on *McCoy* is misplaced, as Belcher did not object to the testimony and the testimony itself was not an admission of guilt. *See McCoy*, 584 U.S. at ___, ___, ___, 138 S. Ct. at 1507, 1509, 1512. Rather, this claim is best raised in a timely postconviction petition for a writ of habeas corpus in the first instance. *See Gibbons v. State*, 97 Nev. 520, 522-23, 634 P.2d 1214, 1216 (1981) (declining to consider ineffective-assistance claim even though record suggested ineffective assistance because of possibility that counsel could rationalize his performance at evidentiary hearing). Accordingly, we decline to consider Belcher's ineffective-assistance-of-counsel claim at this time.

*Penalty phase jury instructions*

Belcher argues that the district court erred in giving several penalty phase instructions. He asserts that the instructions defining mitigation impermissibly limited the consideration of mitigating evidence to only evidence related to the offense. He also asserts that the jury should not have been instructed that it could consider hearsay evidence. Belcher did not object below, and we discern no plain error. *See* NRS 178.602; *Green*, 119 Nev. at 545, 80 P.3d at 94-95.

Neither challenged mitigation instruction misstated or misled the jury about the scope of mitigating circumstances. Reading the whole of the two instructions, neither one states or implies that the scope of mitigating circumstances is limited to offense-specific circumstances. *See Watson v. State*, 130 Nev. 764, 784, 335 P.3d 157, 171 (2014) ("Mitigation evidence includes any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a

sentence less than death; accordingly, mitigation is not limited to evidence which would tend to support a legal excuse from criminal liability." (citations and internal quotation marks omitted)). The penalty phase instructions as a whole provided that "other evidence that bears on the Defendant's character" may be presented at the penalty hearing and that the jury "must consider any aspect of the Defendant's character or record and any of the circumstances of the offense that the Defendant proffers as a basis for a sentence less than death." This court has described that language as conveying "the breadth of possible mitigation evidence." *Watson*, 130 Nev. at 786, 335 P.3d at 173. As to the hearsay instruction, Belcher acknowledges that the language is a correct statement of the law, as hearsay is generally admissible at a capital penalty hearing under NRS 175.552(3), and that neither the Confrontation Clause nor *Crawford v. Washington*, 541 U.S. 36 (2004), apply to evidence admitted at a capital penalty hearing, *see, e.g., Summers v. State*, 122 Nev. 1326, 1332-33, 148 P.3d 778, 783 (2006). He asks us to overrule this court's prior decisions, but he offers no arguments beyond those considered and rejected in *Summers* and has not cited any controlling authority that is contrary to *Summers*. Nor has he pointed to any specific instances of hearsay being presented during the penalty phase. For these reasons, any possible error in the challenged instructions is not "so unmistakable that it reveals itself by a casual inspection of the record," as required to establish plain error. *Patterson v. State*, 111 Nev. 1525, 1530, 907 P.2d 984, 987 (1995) (internal quotation marks omitted) (describing when an error is "plain" for purposes of plain-error review).

*Constitutionality of the death penalty*

Belcher argues that the death penalty is unconstitutional. He asserts that it violates the Eighth Amendment's prohibition against cruel

SUPREME COURT
OF
NEVADA

(O) 1947A

and unusual punishment. We have rejected similar arguments, *see, e.g.,* *Thomas v. State*, 122 Nev. 1361, 1373, 148 P.3d 727, 735-36 (2006) (reaffirming that Nevada's death penalty statutes sufficiently narrow the class of persons eligible for the death penalty); *Colwell v. State*, 112 Nev. 807, 814-15, 919 P.2d 403, 408 (1996) (rejecting claims that Nevada's death penalty scheme violates the United States or Nevada Constitutions); *Bishop v. State*, 95 Nev. 511, 517-18, 597 P.2d 273, 276-77 (1979) (similar); *see also Flanagan v. State*, 112 Nev. 1409, 1423, 930 P.2d 691, 700 (1996) (rejecting claims that extended confinement before execution was cruel and unusual punishment), and see no reason to do otherwise here.

*Cumulative error*

Belcher argues that the cumulative effect of errors at trial warrant reversal. "The cumulative effect of errors may violate a defendant's constitutional right to a fair trial even though errors are harmless individually." *Hernandez v. State*, 118 Nev. 513, 535, 50 P.3d 1100, 1115 (2002). Belcher demonstrated two errors: the district court should have suppressed his statement to police, and one of his robbery convictions was not supported by sufficient evidence. As we have granted discrete relief by reversing the robbery conviction, only one error remains, which, in and of itself, is harmless. Therefore, there is nothing to cumulate. *United States v. Allen*, 269 F.3d 842, 847 (7th Cir. 2001) ("If there are no errors or a single error, there can be no cumulative error.").

*Mandatory review of death sentence*

NRS 177.055(2)(c)-(e) requires this court to determine whether the evidence supports the aggravating circumstances found; "[w]hether the sentence of death was imposed under the influence of passion, prejudice or any arbitrary factor"; and whether, considering the crime and the defendant, "the sentence of death is excessive."

SUPREME COURT
OF
NEVADA

(O) 1947A

Sufficient evidence supports four of the five aggravating circumstances found by the jury.[3] The evidence showing that Belcher had a prior conviction for voluntary manslaughter and had been convicted of attempted murder in the guilt phase of trial supported the jury's finding of two aggravating circumstances under NRS 200.033(2)(b) (murder committed by a person who had prior conviction for a violent felony). And the evidence presented at the guilt phase that resulted in convictions for burglary while in possession of a deadly weapon and robbery with the use of a deadly weapon—namely, that Belcher kicked in the door to the victims' home, shot two people who lived in the home, and took property from the home—supports the jury's finding of two more aggravating circumstances under NRS 200.033(4)(a) (murder occurred during course of a burglary or robbery).

We also conclude that the jury did not act under an improper influence in imposing death. The finding of a mitigating circumstance evinces a thoughtful and deliberative jury, particularly when Belcher chose not to appear at or participate in the penalty phase of the trial. There is

---

[3]As we have concluded that Belcher's conviction for robbing Nick was not supported by sufficient evidence, the aggravating circumstance related to that robbery is invalid. We are convinced beyond a reasonable doubt, however, that the jury would have returned the same sentence absent that aggravating circumstance. *See Archanian v. State*, 122 Nev. 1019, 1040, 145 P.3d 1008, 1023 (2006) ("A death sentence based in part on an invalid aggravator may be upheld either by reweighing the aggravating and mitigating evidence or conducting a harmless-error review."); *see also Clemons v. Mississippi*, 494 U.S. 738, 741 (1990) (holding "that the Federal Constitution does not prevent a state appellate court from upholding a death sentence that is based in part on an invalid or improperly defined aggravating circumstance either by reweighing of the aggravating and mitigating evidence or by harmless-error review").

SUPREME COURT
OF
NEVADA

(O) 1947A

nothing in the record that suggests the jury acted "under the influence of passion, prejudice or any arbitrary factor." NRS 177.055(2)(d).

Finally, the death sentence is not excessive in this case. Belcher broke into a home in the middle of the night and shot two unarmed people, killing a 15-year-old child. There is evidence that Belcher killed Alexus to exact revenge against her father with whom he was angry because of a dispute over a drug transaction. There is no evidence that Belcher was under the influence at the time of the murder or that the murder was rash or impulsive or the result of uncontrollable or delusional impulses. *Cf. Chambers v. State*, 113 Nev. 974, 984-85, 944 P.2d 805, 811-12 (1997) (death sentence excessive where defendant was drunk at the time of the murder, there was no advance planning, and there was an emotional confrontation between the defendant and the victim); *Haynes v. State*, 103 Nev. 309, 318-19, 739 P.2d 497, 503 (1987) (death sentence excessive where murder was the result of uncontrollable, irrational, or delusional impulses). This was not Belcher's first experience with the criminal justice system, nor was it his first time committing a crime of violence that resulted in another person's death. He had at least four prior felony convictions, including one for voluntary manslaughter entered just three years before he killed Alexus. Considering both the circumstances of the murder and Belcher's character and history, death was not an excessive sentence.

## CONCLUSION

We conclude that the district court erred in denying Belcher's motion to suppress statements made to police because he was subjected to a custodial interrogation without the benefit of *Miranda* warnings. The State did not argue that the error was harmless. However, after adopting factors to guide this court in deciding whether to consider an error's harmlessness despite the State's failure to argue it and after weighing those

Supreme Court
of
Nevada

(O) 1947A

factors and concluding that sua sponte harmless-error review is appropriate, we conclude that the complained-of error was harmless. We also conclude that Belcher's conviction for robbing Nick (count 2) was not supported by sufficient evidence. No other claims of error have merit. Accordingly, we affirm the judgment of conviction in part and reverse it in part.

_____, J.
Hardesty

We concur:

_____, C.J.
Pickering

_____, J.
Gibbons

_____, D.J.
Shirley

Supreme Court
of
Nevada

(O) 1947A

factors and concluding that sua sponte harmless-error review is appropriate, we conclude that the complained-of error was harmless. We also conclude that Belcher's conviction for robbing Nick (count 2) was not supported by sufficient evidence. No other claims of error have merit. Accordingly, we affirm the judgment of conviction in part and reverse it in part.

_____, J.
Hardesty

We concur:

_____, C.J.
Pickering

_____, J.
Gibbons

_____, D.J.
Shirley

STIGLICH, J., with whom PARRAGUIRRE and SILVER, JJ., agree, concurring in part and dissenting in part:

I agree that the district court erred in admitting Belcher's statement and with the test that the majority adopts to determine when this court should consider the harmlessness of an error even though the State neglected to argue harmlessness. Generally, this court treated the State's failure to argue harmlessness as a concession that the error was prejudicial. *Polk v. State*, 126 Nev. 180, 183 n.2, 233 P.3d 357, 359 n.2 (2010); *Natko v. State*, 134 Nev. 841, 845-46, 435 P.3d 680, 683-84 (Ct. App. 2018); *see generally Talancon v. State*, 102 Nev. 294, 302 n.4, 721 P.2d 764, 769 n.4 (1986) (recognizing that this court declines to consider arguments not raised in an opening brief). This was a severe measure. To temper the impact of this rule, this court would overlook the State's confession of error where the State "inadvertently failed to respond to an inconsequential issue or had a recognizable excuse." *Polk*, 126 Nev. at 185, 233 P.3d at 360. Those exceptional circumstances included meritless issues raised in pro se briefs or for the first time on appeal. *Id.* While there were exceptions to the stringent application of the rule, there was no rubric employed to ensure consistency in deciding whether to find a confession of error in a particular case. Thus, I welcome the adoption of a test to ensure greater intellectual consistency in this court's decisions when the State neglects to argue an error is harmless. My only disagreement with the majority is in how it has applied the test in this case. In my view, this case does not present the rare exception where we should review for harmlessness sua sponte.

Under the newly adopted test, this court looks to three factors in deciding whether to consider an error's harmlessness sua sponte: "(1) the length and complexity of the record, (2) whether the harmlessness of an

error is certain or debatable, and (3) the futility and costliness of reversal and further litigation." *United States v. Rodriguez*, 880 F.3d 1151, 1164 (9th Cir. 2018) (internal quotation marks omitted); *see also United States v. McLaughlin*, 126 F.3d 130, 135 (3d Cir. 1997), *abrogated on other grounds by United States v. Fiorelli*, 133 F.3d 218 (3d Cir. 1998); *United States v. Giovannetti*, 928 F.2d 225, 227 (7th Cir. 1991). In my opinion, all three factors weigh against sua sponte harmless-error review in this case.

As the majority recognizes, the record here is complex and sizable, as it memorializes the proceedings leading up to and including a three-week trial. Three dozen witnesses provided general information about the night of the crimes and details about highly specific evidence attendant to the case. As such, I believe the 44-volume record is large enough to make the harmlessness inquiry a burdensome one absent any guidance from the parties on the issue. *United States v. Gonzalez-Flores*, 418 F.3d 1093, 1100-02 (9th Cir. 2005); *see United States v. Torrez-Ortega*, 184 F.3d 1128, 1136 (10th Cir. 1999) (concluding that 25-volume record of two-week trial was too extensive and complex to engage in forfeited harmless-error review).

In concluding otherwise, the majority relies on this court's obligation to conduct heightened review in death penalty cases. It reasons that further review for harmlessness does not unnecessarily burden the court given that obligation. It is true that "SCR 250 and the internal policies of this court ensure that [death penalty] cases receive extra resources and heightened scrutiny." *Evans v. State*, 117 Nev. 609, 642, 28 P.3d 498, 520 (2001), *overruled on other grounds by Lisle v. State*, 131 Nev. 356, 366 n.5, 351 P.3d 725, 732 n.5 (2015). But this rationale does not take into account the full scope and purpose of SCR 250.

SCR 250 exists to "ensure that capital defendants receive fair and impartial trials, appellate review, and post-conviction review; to minimize the occurrence of error in capital cases and to recognize and correct promptly any error that may occur; and to facilitate the just and expeditious final disposition of all capital cases." SCR 250(1). In this vein, the rule sets forth the required qualifications and duties of attorneys who serve as trial, appellate, and postconviction counsel, SCR 250(2), (3); the duties for courts and court personnel, SCR 250(5)(b), (6)(a), (6)(c), (11); and the duties of the State attendant to the notice of intent to seek the death penalty, notice of evidence in aggravation, and the continuing duty to report to this court on the status of death penalty cases, SCR 250(4)(c), (4)(f), (9). This court indeed has a higher standard of diligence in death penalty cases. But every party involved in death penalty cases is held to a higher standard of diligence. The obligations imposed on the State promote "accountability and diligence" in its prosecution of death penalty cases. *Bennett v. Eighth Judicial Dist. Court*, 121 Nev. 802, 810, 121 P.3d 605, 610 (2005).

Considering these burdens and the reasons for them, we should be more reticent to make harmlessness arguments on the State's behalf, particularly when the error is one of constitutional dimension. This court should review the entire record to ensure a capital defendant receives fair process throughout his or her trial, appeal, and postconviction proceedings and minimize the occurrence of error throughout those stages. *See* SCR 250(1). But it should not use that review to instead "construct the government's best arguments for it without providing the defendant with a chance to respond." *Gonzalez-Flores*, 418 F.3d at 1101. "Where a court analyzes the harmless error issue wholly on its own initiative, it assumes burdens normally shouldered by government and defense counsel." *United*

*States v. Pryce*, 938 F.2d 1343, 1347 (D.C. Cir. 1991); *see Gonzalez-Flores*, 418 F.3d at 1100 ("[I]t is the government's burden to establish harmlessness, and it cannot expect [the court] to shoulder that burden for it."). This court's obligations to afford death penalty cases heightened review should not excuse the State from its neglect, as doing so would "encourage the government's laxness and failure to follow . . . clear, applicable precedent." *Rodriguez*, 880 F.3d at 1163 (quoting *United States v. Murguia-Rodriguez*, 815 F.3d 566, 573 (9th Cir. 2016)); *see United States v. Rose*, 104 F.3d 1408, 1414-15 (1st Cir. 1997) (recognizing that harmless-error review sua sponte may incentivize the government's failure to make proper arguments). Encouraging laxness in appellate briefing by the State in death penalty cases would serve neither this court's nor the State's heightened standard of diligence to minimize error and ensure fair trials in those cases. Additionally, given the clear purpose of SCR 250 to protect a capital defendant's due process rights and minimize trial error, sua sponte harmless-error review should not be used to tolerate carelessness on the part of any party involved. Therefore, I conclude that the size of the record militates against unguided harmless-error review in this case.

I would also approach the second prong of the test differently. Under the new test, the reviewing court must conclude that, after an unguided search of the record, the error's harmlessness is not debatable. *See Giovannetti*, 928 F.2d at 227. This court should only overlook the State's failure to argue harmlessness in extraordinary cases, because when we consider harmless error sua sponte, we might unfairly "construct the government's best arguments for [harmlessness] without providing the defendant with a chance to respond." *Gonzalez-Flores*, 418 F.3d at 1101. Thus, "[i]f the harmlessness of the error is at all debatable, prudence and

fairness to the defendant counsel against deeming that error harmless without the benefit of the parties' debate." *Id.*

When this court undertakes harmless-error analysis, it evaluates whether and the extent to which the error affected the verdict. *Schoels v. State*, 115 Nev. 33, 35, 975 P.2d 1275, 1276 (1999). This analysis involves examining whether the question of guilt is close, the nature of the error, "and the gravity of the crime charged." *Id.* Where there is overwhelming evidence of guilt and the error's effect is insignificant by comparison, an error is generally harmless beyond a reasonable doubt. *Stevens v. State*, 97 Nev. 443, 445, 634 P.2d 662, 664 (1981). But where "guilt is 'woven from circumstantial evidence,'" it may not be clear that an error is harmless beyond a reasonable doubt, particularly an error in the admission of evidence. *Id.* (quoting *Harrington v. California*, 395 U.S. 250, 254 (1969)). Thus, when conducting harmless-error review in a case woven from circumstantial evidence as this one was, this court must get into the weeds to determine whether an error is harmless. That is the analysis that the majority conducted. Essentially, it performed harmless-error review to determine whether it should perform harmless-error review. I feel that this defeats the purpose of the test we adopt today.

In contrast, I believe that when evaluating whether the harmlessness of the error is debatable, this court should take a broader, more casual view of the record. And only if, from this vantage, the court is certain the error had no effect on the jury's verdict, should the court then conclude that it should engage in harmless-error analysis sua sponte. From this broader view, Belcher's statement appears to be a more integral piece of the State's case-in-chief. The State mentioned Belcher's statement, notably his lies to police and attempts to fabricate an alibi for the night of

the crime, during its opening statement and closing arguments. It introduced Belcher's statement and testimony from a witness who refuted Belcher's purported alibi with bank records. This was an important tactic, as the evidence against Belcher was largely circumstantial and not overwhelming. No physical evidence connected Belcher to the scene. No one identified him as the man seen outside the home before the shootings or loading property into the car after the shootings. None of the stolen property was recovered or, despite the size of the property, noted during the traffic stop after the shootings. When questioned by the police, William Postorino initially refuted Belcher's purported motive and pointed to another individual who was dating Ashley Riley, was jealous and abusive, and had access to a white sedan. Nick Brabham's identification was equivocal and Belcher's other inculpatory statements could have been misconstrued by the listener or fabricated by a witness seeking lenient treatment in other criminal proceedings. By framing the trial with Belcher's deception, the State infused doubt over the defense evidence and arguments. Absent physical or forensic evidence, or an unequivocal identification of Belcher at the scene of the shooting, the error's harmlessness is not readily assessed and requires a more thorough search of the record. *See Giovannetti*, 928 F.2d at 227. Based on the difficulty in quantifying the effect that Belcher's statement had on the verdict, I believe the error's harmlessness is debatable.

Finally, the third factor (futility and costliness of reversal and further litigation) does not support harmlessness review in this case. Reversal and further litigation is only futile when the error did not make any difference in the verdict—in other words, when the harmlessness is *not* reasonably debatable. *See id.* at 227 (recognizing that when considering

third-party costs, "reversal may be an excessive sanction for the government's having failed to argue harmless error, at least if the harmlessness of the error is readily discernable without an elaborate search of the record"). When harmlessness *is* reasonably debatable, as I believe it is here, reversal and further litigation is not futile precisely because of the uncertainty as to whether the verdict would have been the same absent the error. *See Rodriguez*, 880 F.3d at 1165 (concluding that reversal was not clearly futile because the error's harmlessness was debatable).

In sum, I conclude that the voluminous and complex record makes sua sponte harmless-error review impracticable, the harmlessness of the constitutional error at issue is debatable, and remand is not clearly futile. Thus, we should not relieve the State from the consequences of its waiver. Accordingly, I would reverse the judgment of conviction and remand for a new trial based on the constitutional error in admitting Belcher's un-Mirandized statements during a custodial interrogation.

_____, J.
Stiglich

We concur:

_____, J.
Parraguirre

_____, J.
Silver

SUPREME COURT
OF
NEVADA

(O) 1947A